[No. S015381. June 19, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
TRACEY LAVELL CARTER, Defendant and Appellant.

1172

1174

COUNSEL

Ronald S. Smith, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter, Susan Lee Frierson, Emilio Eugene Varanini IV and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—A Los Angeles County jury convicted defendant Tracey Lavell Carter of the robbery and murder of David Thompson, the robbery of Namora Thompson, the murder and attempted robbery of Leopoldo Salgado, and the attempted robbery and attempted premeditated murder of Manuel Figueroa. (Pen. Code, §§ 187, 211, 664; unless otherwise specified, further statutory references are to the Penal Code.) With respect to each charge, the jury found that a principal was armed with a handgun and that defendant personally used a firearm. (§§ 12022, subd. (a), 12022.5.) With respect to both murder counts, the jury found true robbery-murder and multiple-murder special-circumstance allegations. (§ 190.2, subd. (a)(3), (17)(A).) The jury returned a verdict of death for the murder of David Thompson and one of life imprisonment without possibility of parole for the murder of Leopoldo Salgado. The trial court imposed sentence accordingly, and this appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution case*

##### a. *Thompson murder and robbery*

On the evening of April 9, 1987, David Thompson and his wife Namora Thompson, residents of Tustin in Orange County, drove their 1987 Hyundai to Los Angeles to attend a church-related function. The event ended around 11:00 or 11:30 p.m. One of the members of their church then told Mr. Thompson that the bus carrying fellow church members to Los Angeles had broken down. Mr. Thompson attempted unsuccessfully to telephone the

pastor of the church; then, along with his wife, he went to the location of the inoperative bus to see whether he could be of assistance. When efforts to start the bus failed, Mr. and Mrs. Thompson got back into their car and drove to a telephone booth to try again to contact their pastor. They rejected the first booth they encountered because it was poorly lit and they were concerned for their safety.

Driving further, they stopped at a well-lit gas station with four telephone booths. Mr. Thompson parked the car about six feet away from the booths and got out to make the call while Mrs. Thompson remained in the car. Suddenly, two men approached from behind the car. The first one, who was tall and "kind of fair skinned," got into the phone booth next to Mr. Thompson's. The second, who was more fair skinned than the first man and about three inches shorter than Mr. Thompson, stood in front of Mr. Thompson. The second man then opened the driver's side door of the Thompsons' car, reached in and told Mrs. Thompson to give him the car keys. At that point, a third man, who appeared to be about Mrs. Thompson's height (five feet six inches tall) knocked on the passenger's side window and told her to get out of the car without turning around. She complied. The first man, now standing in front of Mr. Thompson, was telling him to hang up the phone, cursing at him and demanding his money. The man who was standing behind Mrs. Thompson asked if she had any money. She told him she would see, took the wallet from her purse, removed a $10 bill and handed it to him over her right shoulder. When he asked if that was all she had, she told him to look for himself and gave him her wallet, whereupon he insisted she look. The man instructed her to walk towards the back of the car. He then came around the back of the car and got into the backseat on the driver's side, while the first man, who had been at the phone booth, started to get into the driver's seat. As Mr. Thompson hung up the receiver, the first man got out of the car, returned to the phone booth and put the gun to Mr. Thompson's head. As Mr. Thompson prayed aloud, the man shot him. All three men then got into the car and drove away.

Later on the night of the shooting, being under great stress, Mrs. Thompson told police she was unable to identify any of the assailants, and she failed to make an identification from a photographic lineup. At the preliminary hearing and at trial, however, she identified defendant as the man who had shot her husband.

At the time of the Thompson murder, George Austin was driving east on the inside lane of Slauson Avenue. As he approached a Mobil station located at Slauson and Broadway, he heard a gunshot. Looking in the direction of the shot, he observed several phone booths, a small gray car and three Black

males near the car. Two were getting in on the passenger's side of the car, while the third was coming from the phone booth and entering the driver's side of the vehicle. Austin described the third man as a Black man of medium build, five feet six inches to five feet eight inches in height. Although Austin failed to identify defendant at the preliminary hearing, at trial he identified defendant as the man he had seen walking back to the car from the phone booths.

Around 11:00 on the night of the Thompson murder, Homer Butler was at the Mobil station at the corner of Broadway and Slauson. He was often there, assisting people in getting gas, checking oil and doing things of that nature in exchange for some change. On that occasion, Butler heard a woman screaming and, near the telephone booths, saw a man going through a purse, a man in a suit inside the phone booth and a young Black male going through his pockets. Two young Black males were near the woman who was screaming. Realizing a robbery was in progress, Butler hid behind the gas station cashier's booth so he would not be seen. Butler then ran across the street to a barbecue restaurant to dial 911. As he was doing so, he heard a gunshot coming from the robbery scene. Looking over, he saw three to four people drive away. After calling 911, he rushed back across the street. The woman was still screaming hysterically; the man had been fatally shot.

Butler spoke with the police. Detective William Baird testified that Butler had identified defendant's picture in a photographic lineup as looking "familiar to one of the guys in the car['s] right front passenger seat." Subsequently, at some point prior to trial, Baird again spoke with Butler, who said of defendant's picture in the photo lineup, "That's the guy, but I'm not going to testify to it." Butler indicated he feared he would be in danger if he identified anyone and, if called to testify, would deny having done so.

The Thompsons' damaged car was found abandoned in the area of 70th Street and Estrella Avenue, its battery and radio missing. Todd Lavera admitted to Detective Baird that he had thrown Mr. Thompson's wallet into a storm drain at Hoover Street and Florence Avenue; Baird drove there and recovered the wallet.

Detective Baird participated in the arrest of both defendant, then age 18, and Todd Lavera, then age 22. In the course of their booking, the police determined defendant's height to be six feet one inch and that of Lavera to be six feet two inches. Detective Morton Duff took part in arresting Andre Moore, then age 16, whose height was determined, during booking, to be five feet five inches.

 b. *Offenses against Salgado and Figueroa*

On April 10, 1987, Rochelle Stewart lived on Hoover Street next door to Tom's Liquor Store. Around 1:00 a.m. that night, she left that store and was

walking south on Hoover toward her house when she noticed two men whom she described as "Mexican" and whom she did not know (later identified as Manuel Serrano Figueroa and Leopoldo Magania Salgado) in a small blue car. They asked her to get in the car with them, but she refused. Todd Lavera, whom she knew as Buster, approached from behind and asked what she was doing talking to the Mexicans. Two other men walked up behind her; one was short, about five feet four inches, and the other about five feet 11 inches or about the same height as Lavera. The short man, whom she had seen before but whose name she did not know, went up to the blue car, stuck a gun in the driver's window and said, "Give me the money." As the driver (Figueroa) started to roll up the window, the short man fired four shots from what appeared to Stewart to be a small .22- or .25-caliber gun, breaking the window on the driver's side. The Mexican man on the passenger side (Salgado) got out of the car, whereupon the short man fired three more shots at him. The driver pulled out of the driveway. As Lavera stood near Stewart, the other tall man took the gun from the short man and fired two more shots at the passenger. Lavera and the two unknown men then ran to an alley connecting Hoover Street and 73d Street. Salgado's wounds proved fatal.

In speaking with the police later that night, Stewart initially told them she "didn't know who did what," but later identified Lavera, Moore and defendant in separate photo lineups. With respect to defendant's photo, she told the police, "That kind of look [*sic*] like the last person that shot the gun." At the preliminary hearing in this case, Stewart identified Lavera, but testified she did not see the other two men in the courtroom. At trial, she acknowledged she had in fact recognized the other two men at the preliminary hearing, but had been too fearful to identify them because she was then still living in the neighborhood. At Lavera's separate trial, Stewart had identified Moore as the first shooter when he was brought out for her to see, and she testified Lavera was the man who stood beside her during the crime, but she did not recognize defendant as being the second shooter when he was brought out. At defendant's trial, Stewart denied seeing the second shooter anywhere in the courtroom and denied that defendant looked anything like the photograph she had identified as being the second shooter. She also denied ever telling the prosecutor and her investigator that she was afraid to testify.

Vivian Bivians, Todd Lavera's sister, testified she had long known defendant and Andre Moore, and both men were friends of her brother. On the night of the offenses, defendant and Moore were visiting with Lavera at the back of the house where she and Lavera lived with their mother. The house was located about a block from Tom's Liquor Store. At one point their mother asked Lavera to go to Tom's Liquor Store, get a broom and come

right back home with it. Lavera left to go to the store, closely followed by Moore and defendant. Ten to 15 minutes later, Bivians heard two or more gunshots and, thinking Lavera might have been shot, ran to the corner. There she saw defendant walking down Hoover Street with four or five girls. She asked defendant where Lavera was; he replied he did not know. An hour later, she saw Lavera in a police car. Neither Lavera, Moore or defendant ever returned to her house with the broom or any explanation of what had happened.

Manuel Figueroa testified at the preliminary hearing. As he had died of natural causes by the time of trial, his former testimony was read into evidence. Figueroa testified that around 1:15 a.m. on April 10, 1987, he and Salgado were sitting in Figueroa's car at Tom's Liquor Store when a young Black woman walked by. Figueroa and Salgado had been drinking at a club, and Salgado began to flirt with the woman. Three Black men, whose ages he estimated as 20 to 22 years, walked up behind the woman and then approached his car. One of the men walked up to his open window, said, "I'm going to kill you," and took out his gun. The other two men lined up behind the man with the gun, who fired four shots. The second and third shots grazed the back of his head and neck as he ducked forward; the fourth shot hit him behind his right ear. After the fourth shot was fired, Salgado got out of the car. Figueroa unsuccessfully tried to stop him. Figueroa then pulled out of the lot and drove away. He identified Moore as the shooter and Lavera and defendant as the two men lined up behind Moore.

When Figueroa first spoke with the police about the crime, he did not want to cooperate because he was afraid of reprisal. He therefore told the police he could not identify the three attackers and could only describe them as being young and Black. By the time of the preliminary hearing, however, his fear had diminished because he had moved to a new residence, having been paid $1,000 as part of a relocation effort by the district attorney's office.

Officer Arthur Duran of the Los Angeles Police Department was on patrol with his partner in a marked police car during the early morning hours of April 10, 1987. As he reached 73d Street and Vermont Avenue, a radio broadcast informed him that a shooting had occurred at Tom's Liquor Store and that the suspects, three Black men, were running westbound on 73d Street. Duran stopped the patrol car at 73d and Florence and observed three Black males walking westbound on the sidewalk, two walking together and a third some 20 or 30 feet behind the others. When the car's headlights shone on them, the three men ran into the yards of the residences at 936 and 932 West 73d Street. A canine unit responded to the residence toward which

Duran had seen the first two suspects flee; Lavera was found hiding at the rear of that location. The other two suspects were not found. Lavera underwent a gunshot residue test with negative results.

Later that day, Jose Alvarado was cleaning his yard at 940 West 73d Street, across from Tom's Liquor Store, when he found a gun missing its cylinder. He gave it to his mother-in-law, who gave it to the police.

During the autopsy of Salgado, the coroner, Dr. Susan Selzer, retrieved a .22-caliber slug from Salgado's chest. The slug was compared with the gun found in Alvarado's yard.[1] Detective Donald Richards testified that, depending on the brand of revolver and the cylinder used, a .22-caliber revolver could fire between five and nine shots. In his experience, a nail could be used as well as a pin to make the revolver operable.

### c. *Johnny Davenport's extrajudicial statement and testimony*

After defendant, Moore and Lavera were arrested, Detective Morton Duff twice interviewed Johnny Davenport, who knew all three suspects and who, by the time of trial, was incarcerated at Avenal State Prison on a 1987 robbery conviction. During the second interview, Davenport gave a statement that, redacted to eliminate minor irrelevancies, read as follows:

"It was about Noon when this guy from the Eight-Trey I know as Blackie came over. He was telling me, Tracey [Carter], Andre [Moore], and Todd [Lavera] that he had gotten into a fight with an East Coaster who killed a guy named Otis that was from our set. Todd got real mad about it and said he had a 'gat' (a gun) and he wanted to go bust on the East Coast. Todd left for five to ten minutes and then came back with this old raggedy .22 pistol. When he showed it to us it had a nail holding the cylinder. When he pulled out the nail, it fell apart. Todd was asking if anyone had some more shells because he only had about (4) in the gun. [¶] . . . I stayed around the house until 12:00 or 1:00 p.m. then I went over to Andre's. Andre started telling me about the Mexicans at the liquor store. Andre said he tried to jack them and when he stuck the gun up to the window, the guy tried to roll the window up on his hand. Andre said he dropped the gun and when he picked it up he started shooting at both the Mexicans. Andre said he shot, he ran. While Andre was telling about the Mexicans at the liquor store at Florence and Hoover, Tracey came up. That's why I was wondering why the hood got hot, the police were everywhere. After Andre finished telling me about shooting the Mexicans, they both, Tracey and Andre, started telling me

---

[1]The record does not reflect whether any conclusions were drawn as a result of this comparison.

about a preacher they jacked. Tracey said when he walked up the preacher was at the telephone booth. Tracey told the preacher to give him the money. That's when the preacher started praying. That's when Tracey said he shot the preacher. Tracey said it was at Slauson and Broadway where it happened. I don't know whether it was the same day or the next day. [¶] Andre said they got a car. Then it was Andre who told me about the lady. They got her out of the car and they jetted out. He said they parked the car and threw the keys on the roof. While Andre was telling me about the car, Tracey was there along with some others, but I don't remember who else. It was both Tracey and Andre that was telling me about Todd getting picked after the police dog found him running or hiding on 73rd and Hoover. After the police took him to jail, they let him go. I don't remember whether it was Andre or Tracey that said they threw the gun after they ran from the liquor store."

On direct examination, Davenport testified that he and Moore were members of the 7-4 Hoover Crips, while defendant was a member of the 84 Kitchen Crips.[2] The 7-4 Hoover Crips and the Kitchen Crips would hang out together. Sometimes Davenport would hang out at 70th Street and Bonsallo Avenue with other 7-4 Hoover Crips, and defendant and Moore were sometimes present. Davenport denied having made substantial portions of his extrajudicial statement. Davenport recalled having a conversation, prior to the Thompson murder, with Moore, Lavera and someone named Black concerning the killing of Otis Jones, a member of the 7-4 Hoover Crips, and how Black had had a fight with a member of the East Coast Crips who may have had something to do with Jones's death. Davenport first denied telling the police defendant was present during that conversation, then said he did not remember whether he told them that. Davenport denied telling the police the conversation angered Lavera, or that Lavera said he had a "gat" (i.e., a gun) and wanted to go "bust" on the "East Coast," although he recalled that Lavera went home at that point and later returned with a small gun with a nail holding the cylinder in place. Davenport claimed not to recognize People's exhibit No. 6, the gun found by Jose Alvarado, but acknowledged that during Lavera's trial he had testified the gun looked similar to the one Lavera had possessed during their conversation. The day after the conversation, Davenport testified, he spoke with Moore in the driveway of Moore's residence on Bonsallo Avenue. Moore told Davenport "some Mexicans had got killed." Davenport denied telling the police that Moore told him he tried to "jack" (i.e., rob) them and when he put the gun to the window "the guy tried to roll the window up on his hand." Davenport further denied telling the police that Moore had told him he dropped the gun and, when he picked it up, he started shooting at both the Mexicans. Davenport denied telling the police that, as Moore was telling him about the Mexicans at the liquor store,

_____

[2]Davenport denied that Lavera was a Crip.

defendant came up to them; or that, after Moore finished telling him about shooting the Mexicans, Moore and defendant both started to tell him about how they had "jacked a preacher." Davenport denied telling the police that defendant said the preacher was at the phone booth and that defendant shot the preacher after demanding that he give defendant his money. Davenport denied telling the police that Moore said they got "the lady" out of the car and "jetted out," then parked the car and threw the keys onto the roof. He denied telling the police he didn't remember whether it was Moore or defendant who said they threw the gun after they ran from the liquor store. The prosecutor showed Davenport a three-page statement, marked as People's exhibit No. 31; Davenport acknowledged that the first time he had seen the statement was at the police station in 1987 and that the initials on various lines, as well as the signature at the bottom of each page, were his own. He acknowledged traveling to Lavera's trial by helicopter, accompanied by Detective Duff. He denied, however, telling Duff that everything contained in the statement was true but he could not say so in court because he had to live in the prison system.

On cross-examination, Davenport testified he was first contacted by the police two or three days after the incidents when at least five officers, including Detective Duff, came to his house, handcuffed him and drove him in an unmarked car to the Newton Community station. There he was uncuffed and placed in a small room where he was interviewed by Duff and another officer. Davenport testified the officers had told him something to the effect that they had information that he was with Moore on the day of the crimes, although on redirect examination he acknowledged the officers might have said they had information he and Moore had been talking about the killings. The officers talked with Davenport for six to seven hours, with breaks. At first, he told them nothing, but after they told him they knew he had information about the incident and that he was going to stay in jail until he told them something, he lied to them. Duff wrote down Davenport's statements. Davenport was then released. The following day, officers again picked him up and brought him to Newton station, telling him they knew everything he had said was a lie. Davenport feared they would charge him with the murders, too. Because the officers said his first statement was not good enough, Davenport gave them another statement, like the first "almost all of it" lies. As Duff wrote down Davenport's statement, he altered it, putting in names where Davenport was omitting them. After the statement was complete, Duff allowed Davenport to read the statement and told him to sign it. Davenport complied because he "figured at the time that was the only way for me to get out of jail."

On redirect, however, Davenport acknowledged he had testified at the preliminary hearing in this case that he was not afraid because he knew he

had had nothing to do with the murders. He testified further on redirect that he did not remember giving the statement in People's exhibit No. 31, or parts of it, to Detective Duff; that he had not read the whole statement, but knew that any names it contained were added by Duff because he did not name any names; and that he did tell Duff the matters set forth on the first page, but not the second or third page, of the statement. Davenport acknowledged that if he admitted the matters contained in his statement, he would get a "snitch jacket"[3] in prison, but denied that this caused him any concern.

Detective Duff testified about the circumstances of his interviews with Davenport. Davenport was not a suspect in the two murders and was told he had been named as a person present when the crimes were being discussed. The first interview with Davenport lasted about 30 to 45 minutes. Davenport was asked if it was true he had been present during a discussion of the homicides; he disclaimed being present or knowing anything about it. Duff testified Davenport had lied when he testified the first interview lasted six or seven hours, the second interview lasted seven or eight hours, and that Duff had told him he would be kept in custody until he told the officers what Duff wanted to hear. Duff had heard Davenport lie on other occasions, including once under oath. Duff testified that People's exhibit No. 31 was a summary of what Davenport had told the police. Following the interview Davenport was given an opportunity to read the statement. Apart from adding the word "Andre" to the third line of the statement, Davenport indicated he had no additions or corrections or anything he wanted to delete from the statement. Duff also testified that Davenport told him everything contained in his statement was true, but that he could not testify to it because he was in prison and if he testified the statement was true he would be a dead man. On cross-examination, Duff acknowledged that, although the police station had equipment capable of surreptitiously recording a witness's statement, he chose not to use it while interviewing Davenport.

### 2. *Defense case*

The defense presented no witnesses. Defense counsel argued, in closing, that the prosecution had failed to prove its case beyond a reasonable doubt in view of the questionable identification evidence, Davenport's credibility problems and the assertedly poor police practices in certain aspects of the investigation.

### B. *Penalty Phase*

### 1. *Prosecution case*

The prosecution presented evidence that defendant had previously been convicted of possessing cocaine (§ 190.3, factor (c)) and that he had engaged

---

[3]That is, acquire a reputation as an informant.

in other violent criminal activity, namely the attempted murder of two rival gang members while in pretrial custody in April 1989 and a September 1985 grand theft and robbery (§ 190.3, factor (b)).

### a. *Jailhouse stabbing*

On April 3, 1989, Joevone Elster and Mark Oropeza were incarcerated in the Los Angeles County jail and enrolled in the "Honor Row," a voluntary school program for inmates. Defendant was also enrolled in the Honor Row. All enrollees had cells on the same row. On that date, Elster and Oropeza were attacked as they were returning from school to their cell row. Elster received a five- or six-inch stab wound on his left arm and a laceration to the top of his head. Oropeza suffered multiple wounds on his left arm and hand, a puncture wound behind his ear and another puncture wound to the temple. Elster testified he did not know who had stabbed him or how many people had attacked him. Oropeza likewise testified he did not know who had wounded him. Elster denied being an East Coast Crip; Oropeza admitted he and Elster were East Coast Crips, but denied telling Los Angeles Sheriff's Deputy Frank Plass, who administered the Honor Row program, or jail Deputies Reppucci and Weinman, of his gang affiliation. Elster admitted talking with Deputy Weinman immediately after the attack, but denied telling him that someone had yelled "East Coast Killers" at him. Oropeza denied talking with any jail deputies about the incident and even claimed he did not know what a "shank" was.

Deputy Mark Reppucci testified that around 1:00 p.m. on April 3, 1989, after he had just finished escorting inmates back from school and was closing the gate leading to their row, he saw four men—defendant, an inmate named Paul Brown, Elster and Oropeza—fighting. Reppucci and his partner, Deputy Weinman, told the inmates to stop fighting. When the backup summoned by Weinman arrived, the deputies broke up the fight. Reppucci searched all the inmates involved in the fight and found a shank, a "jail-made stabbing device," in Brown's front pocket. Although he found nothing on defendant, defendant admitted he had thrown something down the row. Elster and Oropeza had no weapons on them. Elster told Reppucci that as he was coming back from school, Brown approached him and started shouting "East Coast Killers," which Elster understood to mean that Brown and defendant killed East Coast Crips. Reppucci testified that based on his independent knowledge and defendant's tattoos with the letters "K" and "C," defendant was a Kitchen Crip, and Elster and Oropeza were East Coast Crips.

Deputy Plass testified that he interviewed and screened inmates, including defendant, who volunteered for the Honor Row program. Plass testified he

made it clear to all interested inmates that participants would be required to set aside any anger and resentment towards members of rival gang-sets who might be participating in the program. He informed them that any violation of the rules would be enough to remove them from the program. When defendant was selected, he had no significant disciplinary problems and appeared eager to get into the program.

In the course of investigating the assault on Elster and Oropeza, Plass interviewed defendant. After being advised of and waiving his *Miranda* rights,[4] defendant told Plass that he and Paul Brown, a fellow Kitchen Crip, had heard rumors that members of the East Coast Crips were going to "get up at" or attack the Kitchen Crips. Because defendant and Brown felt insecure in being the only Kitchen Crips on the Honor Row, they decided to strike first. Accordingly, defendant made a shank by melting an underarm deodorant container, rolling it to a desired length and thickness, and sharpening it to a point with a cutting edge. The completed weapon was four to six inches in length, with a two- to three-inch blade. The day before the attack, defendant packed all his belongings in his cell and removed the pictures from his cell walls, as if—Plass testified—he anticipated leaving the module. Then, when he, Brown, Elster and Oropeza walked onto the row after returning from school on April 3, 1989, defendant put the shank in the palm of his hand and began to punch with his fist and stab with the shank, yelling "East Coast Killers." After defendant used the shank, he threw it down the "freeway" or corridor leading to the back of the row. Plass testified that the module was searched for the shank, without success. For deputies to fail to find such items was not uncommon, as they can easily be placed in a toilet and flushed into the main sewer system. Defendant's attitude as he told Plass what happened was "cavalier"; he showed no remorse and told Plass he had wanted to get as many East Coast members as he could.

### b. *Robbery of pickup truck*

On September 24, 1985, Margarito Gomez was sitting with his daughter Yadira in his green 1976 Chevrolet pickup truck in the parking lot of a junior high school. Two men approached the driver's side of the truck. One pulled out a gun and asked for Gomez's keys. Gomez gave him the keys. The man then asked Gomez to get out of the truck, and Gomez complied. The other man had gone to the passenger's side of the truck and asked the daughter to get out; she did so. The men then got into the truck and drove away.

The next day, Gomez reported the robbery to the police. Deputy Sheriff Anthony Pachot testified that when he showed Gomez a photo lineup,

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*).

Gomez tentatively identified defendant's picture as that of the person who had pointed the gun at him. Pachot testified further that Gomez's daughter was unable to identify anyone from the same photo lineup, but she did provide descriptions of the suspects, one of which fit defendant almost "to a 'T.'"

Defendant's mother, meanwhile, had gone to the Los Angeles Sheriff's Department Firestone station with what turned out to be Gomez's stolen pickup truck. She told Deputy Pachot that defendant had informed her he had purchased the truck, but because he had no bill of sale she wanted the station to check the truck and make sure it was not stolen. Based on this information, Pachot went to El Camino High School in Woodland Hills to question defendant, who was a student there. After being advised of his rights and waiving them, defendant stated he had purchased the truck from an individual named Eric for $800 in cash at the intersection of Gage Avenue and Figueroa Street. Defendant claimed to have known Eric for four years but not to know Eric's last name or where he lived. Nor did defendant, who was not employed and whose mother had not given him money, appear to possess the means to make such a purchase. Based on his investigation, Pachot booked defendant on charges of grand theft and robbery.[5]

### 2. *Defense case*

The defense presented the testimony of several of defendant's friends and family members in order to show that defendant had originally been a person of good character before he started making bad choices as a result of immaturity, low intellect and poor environment. Dr. Michael Maloney testified regarding the results of interviews and psychological testing conducted with defendant. Defendant also testified in his own behalf, discussing the offenses he was alleged or found to have committed and expressing remorse for the Thompson and Salgado killings. In closing argument, counsel suggested the state of the evidence supported a lingering doubt as to whether defendant or Lavera was the triggerman in the Thompson and Salgado murders.

Defendant's uncle, Curtis Carter, testified that defendant was an industrious child who did well in school and had a close relationship with Carter's daughter. Defendant lived with his grandmother, Helen Williams, from early childhood until age 14, when he moved in with his mother. Defendant began to get into trouble around age 14 for stealing, incurring commitments to Camp Scott and, about two months after his release from camp, to the California Youth Authority. At some point defendant was returned to custody for selling dope. The first time Carter ever heard that defendant was

---

[5]Defendant testified that the charges were dismissed at the preliminary hearing.

involved in gang activity was when he was arrested in the present case. Since his arrest, Carter had visited defendant in jail some 15 to 20 times, where he seemed scared and remorseful. Carter opined that defendant was a decent human being who could make something of his life if he had the chance.

Roy W. Roberts II, the executive director of the Watts/Willowbrook Boys and Girls Club, testified he had known defendant since the latter was five years old. Defendant was a member of the club from the approximate ages of seven to 12. Roberts had found him an energetic young man, who wanted to do well and make his mother proud of him. Defendant's family moved away and Roberts lost contact with him when defendant was about 12; Roberts was unfamiliar with the details of defendant's juvenile record of theft and violence.

Audrey Carter, defendant's mother, testified she was currently employed as an emergency room nurse. She was 16 years old when defendant was born and thereafter attended school at night while her mother and sister cared for defendant. Defendant's father was Michael Hall, who was killed when defendant was three years old. Ms. Carter moved out of her mother's house when she was 21, but because she was still in school and needed help raising defendant, he stayed with her mother during the week until he was about 14 or 15. Until about age 13, defendant would go to church and would read and talk about the Bible. When defendant initially went to school, he got along well there and had no problems apart from stuttering. He was, in her opinion, a follower rather than a leader at that point in his life. When defendant was about 15 or 16, however, he began hanging around with members of the Kitchen Crips who lived near his grandmother's home, including Johnny Davenport and Andre Moore. Although she told him not to hang around with them, he did so anyway. She confirmed many details of defendant's juvenile misconduct. She urged the jury to spare defendant's life.

Defendant's aunt, Gwendolyn Jones, grew up with defendant and was like a "bigger sister." He was a good person who helped the family all the time. After his return from juvenile camp, defendant appeared to be trying to act tougher and was hanging out with the gang more. After defendant's arrest in this case, she visited him in county jail, where he appeared nervous, scared and sorry about being in this situation.

Carolyn Jones, Gwendolyn's sister and another of defendant's aunts, also lived and grew up with defendant. Defendant was a shy child who was scared of lots of things, including a nearby park where members of the Bloods would beat up on children. When defendant was 11 years old, he

became friendly with members of the Kitchen Crips. He would get into trouble because he would hang around with gang members as they went to rob people. Before he went to jail, he was "like the quiet type." After, he was "a little noisier than what he was." After his arrest in this case, he told her he was sorry for being involved. She urged the jury to spare his life.

Helen Williams, defendant's grandmother, and Doris Hamilton, his aunt, testified, inter alia, regarding his religious upbringing. Ms. Williams testified that defendant had told her he did not commit the crimes; Ms. Hamilton opined that defendant was innocent; both expressed the hope the jury would spare his life.

Dr. Michael Maloney, a clinical and forensic psychologist and clinical professor of psychiatry, interviewed defendant before and after the jury returned guilt verdicts and spoke with defendant's family members, administered various psychological tests, and reviewed defendant's school records and the preliminary hearing transcript. Defendant's intelligence fell in the "borderline" range; he was "certainly not mentally retarded," but was "functioning below average." Academic achievement testing put defendant at the seventh grade level in reading and fifth grade level in arithmetic. Administration of the Minnesota Multiphasic Personality Inventory (MMPI) revealed a high elevation for hypomania (a tendency to be impulsive and overly energetic and to experience periods of irritability, hostility and aggressive outbursts) and a lesser elevation for psychopathic deviancy or what today would be called antisocial personality disorder. Neither the MMPI nor the other standard tests administered by Dr. Maloney suggested that defendant had any significant mental disorders. In the postverdict interview, defendant tearfully said he was sorry about the whole situation and spoke of the impact it might have on his family and that of the victims. He admitted participating in the robberies, but denied killing anyone. On cross-examination, the prosecutor explored certain discrepancies between her own records of defendant's juvenile misconduct and the self-reported history on which Dr. Maloney had exclusively relied. Dr. Maloney testified that none of the records of defendant's juvenile adjudications would change his opinion of defendant's credibility or psychological profile.

Defendant testified in his own behalf. Regarding the jailhouse stabbings of Elster and Oropeza, he testified he had heard rumors from friends belonging to the Compton Crips set that the East Coast Crips were going to kill him. He could not tell the police of these rumors because "snitches die"; thus, according to defendant, he had to protect himself. The day he attacked Elster and Oropeza, he knew something was going to happen because some East Coast gang members were talking "crazy" and "disrespectful," yelling

"Kitchen Killer" and spitting on his friend Paul Brown. Neither Elster nor Oropeza said anything to him, stared at him or insulted him, but he thought they would be involved in the rumored attack because they were East Coast Crips members. Defendant did not plan the attack, which he considered to be an act of self-defense, or speak with Brown about it, in advance. On cross-examination, defendant admitted he had received several disciplinary measures in jail for insubordination, possessing a shaving razor in his cell and disrespecting staff.

Regarding the Thompson and Salgado murders, defendant testified that after he was arrested, Detective Duff asked him if he wanted to speak about the case. At first he told Duff he would not speak to him unless a lawyer were present. Later, however, he chose to speak with the police without a lawyer and to tell them what happened. The day of the Thompson murder, defendant met Todd Lavera and Andre Moore at a hamburger stand; Lavera asked him if he had any bullets for Lavera's gun. Lavera talked about "busting" on the East Coast, and the three engaged in "small talk" about carrying out robberies. Knowing Lavera had a loaded gun, defendant walked with Lavera and Moore to Broadway and Slauson. There they encountered Clyde Moore, whom defendant knew from the California Youth Authority. Clyde informed them he had seen a man in a telephone booth, commenting, "There go a jack right there."

Defendant, Lavera and Andre Moore walked over to the telephone booth. Moore pulled out a fake gun and robbed Mrs. Thompson; Lavera walked up to the phone booth and shot Mr. Thompson. Defendant, meanwhile, was hanging back near the Thompsons' car; Moore handed him the money, and they all drove off in the car. According to defendant, he and Lavera are the same height, color and build, and he could be mistaken for him. Defendant felt bad because it was only supposed to be a robbery, "not taking no man's life."

The three drove to 69th Street and Broadway Boulevard, where Moore parked the car and gave an acquaintance the keys. Defendant then went to his house and checked on his mother, then proceeded to Lavera's house, where they sat around talking. They went to the liquor store, bought two 40-ounce bottles of Olde English and three packs of cigarettes, and returned to Lavera's house. While there, Lavera and Moore decided to pull a "jack" on someone, and all three walked back to the liquor store. They saw "the Mexicans" in a car parked in the lot at the back of the store. Defendant went inside for a moment to talk to a man named Carl, who worked there. When defendant left the store, Moore was standing at the driver's window of the Mexicans' car with the gun in his hand. The driver rolled up the window and

started to drive off. Moore fired the gun three times; the gun fell to the ground, whereupon Lavera picked it up. The passenger jumped out of the car and tried to run; Lavera fired three more times, and the man fell. Defendant told the police he did not kill Mr. Thompson and did not know that Moore or Lavera would kill anyone in the liquor store robbery.

## II. ANALYSIS

### A. Guilt and Special Circumstance Phase

#### 1. Admission of gang evidence

 Denying a defense motion in limine to preclude the admission of gang evidence, the trial court allowed the prosecution to present testimony by witness Johnny Davenport that defendant was a member of the 84 Kitchen Crips gang set. The court also allowed expert testimony by Mark J. Arneson, a Los Angeles police detective who specialized in investigations of gang-related crimes, regarding the state of the relations between the 7-4 Hoover Crips, their allies the Kitchen Crips, and their enemies the East Coast Crips; the gangs' respective territories; and the significance of the phrase "bust on the coast." Detective Arneson also testified that if a 7-4 Hoover Crip entered East Coast Crips territory, he would not have done so mistakenly. Defendant contends this evidence, to which we refer collectively as the "gang evidence," was irrelevant and prejudicial, and that its erroneous admission violated his state and federal constitutional rights to due process and a fair trial.

Reviewing the trial court's ruling on this evidentiary question for abuse of discretion (*People v. Champion* (1995) 9 Cal.4th 879, 923 [39 Cal.Rptr.2d 547, 891 P.2d 93]), we find no error. Although evidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged— and thus should be carefully scrutinized by trial courts—such evidence is admissible when relevant to prove identity or motive, if its probative value is not substantially outweighed by its prejudicial effect. (*People v. Williams* (1997) 16 Cal.4th 153, 193 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

In the present case, the relevancy of the gang testimony lay in the following circumstances: The 84 Kitchen Crips, to which set defendant belonged, enjoyed friendly relations with the 7-4 Hoover Crips, to which set coperpetrators Andre Moore and Todd Lavera belonged. The 7-4 Hoover Crips, however, were on bad terms with the East Coast Crips, who were known to meet at the Mobil gas station at Slauson and Broadway, where the

Thompson robbery murder was committed. Around noon on the day of the offenses at issue in this case, a member of the Eight-Trey set, named Black or Blackie, talked with Davenport, Lavera, Moore and defendant about the killing of a 7-4 Hoover Crip named Otis Jones by an East Coast Crip. Lavera reacted angrily, declaring he wanted to go "bust on the coast"; he left and returned with the distinctive handgun later used in the Thompson and Salgado crimes. Lavera asked his companions for more shells, as he had only four in his gun. The term "bust on the coast" signified an intention to commit a retaliatory shooting in East Coast Crip territory.

Identity was an issue in the case. From the foregoing evidence the prosecution sought to have the jury infer that defendant, Moore and Lavera went armed to the Mobil gas station in order to carry out a shooting in a rival gang's territory. The evidence of Davenport's prior statement tended to establish that defendant, Moore and Lavera were together before the Thompson shooting and, to the extent the eyewitness identifications of Moore and Lavera as having been involved in the Thompson and Salgado offenses were stronger than those pointing to defendant, that defendant, too, was present during those offenses. Motive likewise was significant insofar as it shed light on defendant's intent in being present at the scene of the Thompson shooting and, in particular, on whether defendant entertained an intent to kill, as required for the prosecution to prove the robbery-murder special-circumstance allegation in this *Carlos*-era case. (See *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]; *People v. Vidaurri* (1980) 103 Cal.App.3d 450, 461 [163 Cal.Rptr. 57].)

Defendant disputes these conclusions, arguing the prosecution failed to demonstrate the existence of any connection between the crimes against the Thompsons and the fact they occurred in East Coast Crip territory. Defendant observes that the evidence failed to suggest that Thompson or Salgado were East Coast Crips, or that he intended specifically to shoot them because of their perceived gang membership. In our view, however, the prosecutor was not required to establish such circumstances as a predicate to the admission of the challenged gang evidence. Notably, Detective Arneson testified that the phrase "bust on the coast" meant "to shoot someone in East Coast Crip territory," not to shoot an East Coast Crip specifically, and that a known meeting location for the East Coast Crips was the very Mobil gas station where the Thompson shooting occurred. The jury might reasonably infer that for a gang to commit a shooting at a rival's meeting place would be a hostile and perhaps retaliatory show of force, whether or not the victim was a member of that rival gang. And, as the Attorney General points out, if the jury had believed defendant to have been merely an aider and abettor of the killing, his motive in accompanying two 7-4 Hoovers to an East Coast

Crip meeting place would have been the only evidence suggesting he possessed the intent to kill or to aid Moore and Lavera in killing the victim. That the jury in fact found defendant was the actual killer could not have been predicted with certainty when the question was hotly contested at trial. Thus, the gang evidence was quite significant and not cumulative of any other evidence introduced on the issues of motive and intent. The trial court, moreover, properly instructed the jury on the limited purposes for which it was admitting the gang evidence. Accordingly, we conclude the trial court did not abuse its discretion in admitting the challenged evidence. Defendant's claims of federal constitutional error, entirely dependent as they are on his claim of state law error, likewise must fail.

### 2. *Admission of Andre Moore's extrajudicial statements*

█ Defendant contends the trial court erroneously admitted Johnny Davenport's prior written statement to the police describing, inter alia, a conversation in which Andre Moore recounted the Salgado robbery and shooting and which defendant at some point joined. Prior to Davenport's testimony, the defense moved to exclude as hearsay any statements by Davenport concerning what Moore and Lavera had told him. The prosecution argued, and the trial court ultimately agreed, that the statements regarding the Salgado offenses were admissible against defendant as adoptive admissions. Defendant contends this ruling violated· state evidentiary law (Evid. Code, § 1221) and his state and federal constitutional right of confrontation.[6]

Pursuant to Evidence Code section 1221, "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." Defendant contends Davenport's statement does not establish that defendant was present when Andre Moore spoke of the Salgado offenses; lacking proof, therefore, that defendant knew what Moore had said in this regard, he contends the trial court abused its discretion in admitting Moore's statements under the doctrine of adoptive admissions.

An even more fundamental problem with treating as an adoptive admission defendant's failure to contradict Moore's recounting of the Salgado offenses is that nothing in Moore's remarks referred to defendant or accused him of anything. There being, in essence, nothing for defendant to deny, a condition of the hearsay exception for adoptive admissions did not exist, and

---

[6]We note that defendant forfeited his constitutional claims by failing to object on these grounds at trial. (*People v. Millwee* (1998) 18 Cal.4th 96, 128-129 [74 Cal.Rptr.2d 418, 954 P.2d 990].)

the trial court therefore erred in concluding Moore's remarks were admissible as adoptive admissions. (See *People v. Edelbacher* (1989) 47 Cal.3d 983, 1011 [254 Cal.Rptr. 586, 766 P.2d 1].)

The error, however, was harmless under any standard (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243]) in view of the testimony of Rochelle Stewart identifying defendant as one of the shooters in the Salgado killing; Vivian Bivians's testimony placing defendant in the company of Lavera and Moore near the scene, shortly before the murder; and the absence in Moore's statement to Davenport of any mention of defendant as having been present at, or taken part in, the Salgado killing.

### 3. Trial court's failure to instruct sua sponte with CALJIC No. 2.71.5

Defendant contends the trial court erred prejudicially in failing to instruct the jury, sua sponte, with CALJIC No. 2.71.5, concerning adoptive admissions,[7] in connection with the statements by Moore and Lavera as recounted in Davenport's extrajudicial statement. Several Court of Appeal decisions have held the court has a sua sponte duty to give an instruction like CALJIC No. 2.71.5. (*People v. Smith* (1986) 187 Cal.App.3d 666, 679-680 [231 Cal.Rptr. 897]; *People v. Humphries* (1986) 185 Cal.App.3d 1315, 1335-1336 [230 Cal.Rptr. 536]; *People v. Vindiola* (1979) 96 Cal.App.3d 370, 382 [158 Cal.Rptr. 6]; *People v. Atwood* (1963) 223 Cal.App.2d 316, 332-333 [35 Cal.Rptr. 831].) But *People v. Smith* and *People v. Humphries* contained no analysis, and the other two decisions lack continuing validity in view of *People v. Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].[8] In *Collie*, we held that the trial court has no sua sponte duty to instruct on the limited purpose for which evidence of other crimes was

---

[7]As applicable to this case, CALJIC No. 2.71.5 provides: "If you should find from the evidence that there was an occasion when the defendant (1) under conditions which reasonably afforded him an opportunity to reply; (2) failed to make a denial in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which this defendant now is on trial or tending to connect him with its commission; and (3) that he heard the accusation and understood its nature, then the circumstance of his silence and conduct on that occasion may be considered against him as indicating an admission that the accusation thus made was true. Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and conduct of the accused in the face of it. Unless you find that the defendant's silence and conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement."

[8]In *People v. Pensinger* (1991) 52 Cal.3d 1210, 1268-1269 [278 Cal.Rptr. 640, 805 P.2d 899], we hinted at the possible existence of a sua sponte duty to instruct the jury with CALJIC No. 2.71.5, although our opinion spoke only of an obligation to instruct the jury to view a defendant's admissions with caution.

admitted. We distinguished such evidentiary matters from the sua sponte duty to instruct regarding defenses and lesser included offenses, which "are required because those matters are 'closely and openly connected' with the evidence and the fate of the defendant in cases to which they apply." (*People v. Collie, supra,* at p. 63.) We concluded that the defendant had "fail[ed] to show that the limited admissibility of particular bits of evidence of past criminal conduct normally deserves similar unsolicited recognition and instruction by the trial court." (*Id.* at pp. 63-64.) The same reasoning applies to CALJIC No. 2.71.5. Trial courts are not to be "saddle[d] . . . with the duty . . . to review the entire record at trial's end in search of" adoptive admissions. (*People v. Collie, supra,* at p. 64.)

As CALJIC No. 2.71.5 explains, adoptive admissions require certain foundational facts. Trial courts may certainly instruct on the matter if they think it best to do so. But, as the Evidence Code makes clear, courts are *required* to so instruct only at a defendant's request. When the court admits evidence subject to the existence of preliminary facts, it "[*m*]*ay, and on request shall,* instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." (Evid. Code, § 403, subd. (c)(1), italics added.) "On its own terms, this provision makes it discretionary for the trial court to give an instruction regarding a preliminary fact unless the party makes a request." (*People v. Lewis* (2001) 26 Cal.4th 334, 362 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

In a given case, it may be far from clear whether the defendant would wish the court to give CALJIC No. 2.71.5. The instruction is largely a matter of common sense—silence in the face of an accusation is meaningful, and hence may be considered, only when the defendant has heard and understood the accusation and had an opportunity to reply. Giving the instruction might cause the jury to place undue significance on bits of testimony that the defendant would prefer it not examine so closely. (Cf. *People v. Phillips* (1985) 41 Cal.3d 29, 73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423] [for similar reasons, a court has no sua sponte duty to instruct on the elements of other crimes at the penalty phase of a capital trial].)

For these reasons, we hold that a trial court must give CALJIC No. 2.71.5 only when the defendant requests it. Consequently, the trial court in this case did not err in this regard.

### 4. *Trial court's failure to admonish jury pursuant to section 1122*

■ Defendant contends the trial court erred reversibly in failing to admonish the jury at each adjournment, pursuant to section 1122,[9] not to converse among themselves, or with anyone else, on any subject connected with the trial, or to form or express an opinion about the case until the cause was finally submitted to them. Indeed, defendant asserts the trial court *never* properly admonished the jury at any point during the trial. The Attorney General, however, cites three instances during the voir dire process in which the trial court admonished the jury venire along the lines of section 1122. The Attorney General also cites several instances in which the clerk's transcript refers to the jury's having been admonished although no corresponding language can be found in the reporter's transcript. Defendant relies on the principle that, where the clerk's and reporter's transcripts conflict, the latter controls when, under the circumstances, it is the more reliable (see *People v. Smith* (1983) 33 Cal.3d 596, 599 [189 Cal.Rptr. 862, 659 P.2d 1152]; *In re Moss* (1985) 175 Cal.App.3d 913, 928 [221 Cal.Rptr. 645]), while the Attorney General contends defendant has not met his burden of "developing the record by resorting to whatever methods of reconstruction might be available." We agree with defendant that nothing before us suggests a "lacuna" in need of "reconstruction" by settled statement or other means, as opposed to a simple failure to admonish, and that the trial court thus erred.

We depart from defendant, however, and conclude he has failed to show prejudice, as required for reversal. (*People v. Gastelum* (1965) 237

---

[9] At the time of trial, section 1122 provided: "The jury must also, at each adjournment of the court before the submission of the cause to the jury, whether permitted to separate or kept in charge of officers, be admonished by the court that it is their duty not to converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them." (Stats. 1969, ch. 520, § 2, p. 1131.)

Subsequent to the trial in this case, section 1122 was amended to designate the existing text as subdivision (b) and to add subdivision (a), as follows: "After the jury has been sworn and before the people's opening address, the court shall instruct the jury generally concerning its basic functions, duties, and conduct. The instructions shall include, among other matters, admonitions that the jurors shall not converse among themselves, or with anyone else, on any subject connected with the trial; that they shall not read or listen to any accounts or discussions of the case reported by newspapers or other news media; that they shall not visit or view the premises or place where the offense or offenses charged were allegedly committed or any other premises or place involved in the case; that prior to, and within 90 days of, discharge, they shall not request, accept, agree to accept, or discuss with any person receiving or accepting, any payment or benefit in consideration for supplying any information concerning the trial; and that they shall promptly report to the court any incident within their knowledge involving an attempt by any person to improperly influence any member of the jury." (§ 1122, as amended by Stats. 1994, ch. 869, § 4, pp. 4404-4405.)

Cal.App.2d 205, 207 [46 Cal.Rptr. 743].)[10] First, we observe that the trial court did, during the voir dire process, several times admonish the venire in the spirit of section 1122. Second, none of the circumstances defendant cites as demonstrating prejudice actually establish that any juror violated the statutory admonition. In particular, Juror H.'s posttrial statement that he made up his mind to vote for death after hearing a rereading of testimony, which assertedly occurred only during *guilt phase* deliberations, is insufficiently specific to constitute an admission of misconduct and would appear inadmissible under Evidence Code section 1150, subdivision (a) in any event. And Juror H.'s alleged statement to trial counsel suggesting that H.'s taking another juror out to dinner during penalty phase deliberations enabled the jury to reach a verdict did not establish that defendant's case impermissibly served as a topic of conversation during the alleged dinner. The failure to show prejudice likewise dooms defendant's derivative claim of ineffective assistance of counsel. Reversal, therefore, is not required.

### 5. *Trial court's failure to request special jury finding on intent to kill*

■ Because the Thompson and Salgado murders were committed during the "window" period between our decisions in *Carlos v. Superior Court,* *supra,* 35 Cal.3d 131 and *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], in order to find true the robbery-murder special-circumstance allegations in this case the jury had to find that defendant intended to kill the victims. (See also *People v. Turner* (1984) 37 Cal.3d 302, 328-329 [208 Cal.Rptr. 196, 690 P.2d 669] [pre-*Anderson* decision holding multiple-murder special circumstance required intent to kill].) Accordingly, the trial court instructed the jury with CALJIC No. 8.80, setting forth such intent requirement. Defendant asserts this instruction conflicted with the instructions defining the robbery-murder and multiple-murder special circumstances, CALJIC Nos. 8.81.17 and 8.81.3, and contends the jury's special circumstance findings in his case are fatally flawed in the absence of specific written findings that he possessed the intent to kill. We reject both contentions as a matter of state law: Read together, the instructions adequately informed the jury that it had to find intent to kill for a true finding on either special circumstance allegation (*People v. Duncan* (1991) 53 Cal.3d 955, 974 [281 Cal.Rptr. 273, 810 P.2d 131]), and no written findings on the point were required (§§ 1150 [generally requiring jury to reach general verdict], 190.4, subd. (a) [containing no requirement of specific written findings of intent on special circumstance allegations]; *People v. Arias* (1996) 13 Cal.4th 92, 157-158 [51 Cal.Rptr.2d 770, 913 P.2d 980] [provided jury is properly instructed, special findings on each fact or element underlying a special circumstance verdict are not required]). Although in an

---

[10]We also reject defendant's unsupported assertion that the error affected the entire framework of the trial and requires reversal per se.

appropriate case the trial court may protect the record by requiring the jury to explain, in special findings, which of several alternate theories was accepted in support of a general verdict (*Arias, supra,* at p. 158, citing *People v. Webster* (1991) 54 Cal.3d 411, 446-447 [285 Cal.Rptr. 31, 814 P.2d 1273]), in this case the defense never requested such findings, and defendant cites no authority requiring the trial court sua sponte to direct the jury to make such findings. Because defendant cites no authority dictating a different conclusion under the federal Constitution, we reject his contention that the absence of a special finding on intent to kill violated his state and federal constitutional rights to a fair trial, due process of law, and a reliable special circumstance and penalty determination.

### B. *Penalty Phase*

#### 1. *Admission of gang evidence*

■ Defendant contends that the admission, during the penalty phase of trial, of assertedly irrelevant and prejudicial gang evidence violated state law and deprived him of his state and federal constitutional rights to a fair trial, a reliable penalty determination and due process of law. During her redirect examination of Deputy Frank Plass, the senior sheriff's deputy assigned to the custody division at the men's central jail, the prosecutor asked him whether he saw any other Kitchen Crips in the courtroom that day, and Plass answered in the affirmative. Over defense counsel's relevancy objection, the trial court allowed the evidence in order to show Plass's familiarity with the gang. Defendant also argues that the trial court's expression of concern that no members of the audience should sit directly behind the jurors contributed to an atmosphere of fear in the courtroom and to the denial of his constitutional rights.

Because defendant objected at trial only to the question asked Plass, and to that only on relevancy grounds, he forfeited the constitutional claims he now seeks to raise. (*People v. Earp* (1999) 20 Cal.4th 826, 884 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Even were the claims properly preserved for appeal, we would find they lack merit. As the trial court ruled, the questioning was relevant in response to the defense cross-examination of Plass with respect to his expertise in the field of gangs. Defendant argues that the testimony, coupled with the court's concern over seating arrangements in the courtroom, implicated cases dealing with courtroom security arrangements, in which courts have held some practices to be inherently prejudicial. (E.g., *Estelle v. Williams* (1976) 425 U.S. 501, 503-504, 512 [96 S.Ct. 1691, 1692-1693, 1696-1697, 48 L.Ed.2d 126] [fair trial right requires that defendant not be forced to wear prison clothing when appearing before a jury];

*Illinois v. Allen* (1970) 397 U.S. 337, 344 [90 S.Ct. 1057, 1061, 25 L.Ed.2d 353] [requiring disruptive defendant to appear before the jury bound and gagged should be considered only as a last resort, due in part to concomitant reduction in the defendant's ability to communicate with counsel, an important incident of the right of presence]; *Kennedy v. Cardwell* (6th Cir. 1973) 487 F.2d 101, 108 [presence of a security force inside the courtroom may deny a fair trial by creating a prejudicial impression that defendant is dangerous].) We disagree with defendant that the challenged redirect examination of Deputy Plass may be so categorized. The questioning was brief and noninflammatory, and went unmentioned in the parties' respective closing arguments, and thus was not inherently prejudicial. The trial court therefore did not abuse its discretion in allowing the testimony. As for the trial court's directive regarding courtroom audience seating, the Attorney General correctly observes that the record contains no indication whether the persons asked to move were gang members or whether the jury likely would have inferred such membership; nor does the record suggest the move would have been interpreted as a security measure. Consequently, on this record defendant fails to establish that an error of constitutional dimension occurred.

### 2. *Boyd error*

■ Defendant contends the trial court violated his state and federal constitutional rights to due process of law, a fair trial, a reliable penalty determination and equal protection, as well as applicable state sentencing law (§ 190.3, factors (b), (c)), by permitting the prosecutor to cross-examine certain defense witnesses concerning defendant's juvenile court record and aspects of his custodial history not falling within the statutory aggravating factors. Under well-established law, evidence of a defendant's background, character or conduct that is not probative of any specific sentencing factor is irrelevant to the prosecution's case in aggravation and therefore inadmissible. (*People v. Boyd* (1985) 38 Cal.3d 762, 773-774 [215 Cal.Rptr. 1, 700 P.2d 782].) As will appear, assuming for argument's sake the claim is cognizable on this appeal, we conclude it lacks merit.

The issue arises in the following context: The defense called Roy W. Roberts II, the executive director of the boys and girls club defendant had attended between the approximate ages of seven and 12, to testify that defendant was an energetic child who enjoyed sports and did not cause problems at the club. On a number of occasions, Roberts testified, defendant had told him he wanted to stay in school, do well and make his mother proud of him. On cross-examination, the prosecutor asked Roberts if he was aware of defendant's various juvenile adjudications and confinements, including a robbery and a car theft at age 12; an incident, occurring when defendant was

still age 12, in which he was found to have thrown rocks at some people; an incident in which defendant was found to have possessed ammunition; a 1982 robbery adjudication; an adjudication for stealing a bike a couple of months after his release from a youth camp;[11] defendant's Youth Authority commitment at age 14 for a robbery he admitted doing; his commission of another robbery only a month after his release from the Youth Authority; his return to custody in September 1985 on a Youth Authority hold; another return to custody in December of that year; and his conviction of selling cocaine at a school campus in Woodland Hills and consequent return to custody until a mere two months before the commission of the capital offenses.

During the course of cross-examination, the defense objected: "Your Honor, I believe the witness answered that he lost contact [with defendant around age 12], and I will object to reading off every contact that Mr. Carter has had with law enforcement because I think it's improper and I think it gives the jury the wrong impression. [¶] I think it's intentionally misleading them." The prosecutor responded: "[The witness] has essentially been called as a character witness for Mr. Carter and has indicated that he has knowledge of Mr. Carter. [¶] I think I'm entitled to a very broad cross-examination as to what in fact he knows about Mr. Carter and some of the stuff he has indicated that he had heard about and some of the stuff he has indicated he hasn't heard about. [¶] The stuff he hasn't heard about I think the jury should be entitled to consider when weighing his opinion and how much weight to give it. I think this is the typical cross-examination of any kind of character witness." The trial court sustained the defense objection only to the extent the prosecutor had referred to a robbery without specifying whether it had led to a sustained petition, a probation violation or some other disposition.

The Attorney General argues, preliminarily, that defendant failed to preserve fully, with timely and specific objections at trial, the claim he currently raises and fails here to demonstrate, by citations to relevant authority, how the alleged error implicates the state or federal Constitution. Our review of the record reveals that defense counsel objected to the just-quoted line of cross-examination only on the grounds that the prosecutor was, in effect, misleading the jury by incorrectly referring to "convictions" instead of juvenile "adjudications," by cross-examining the witness as to defendant's record despite the latter's acknowledgment that he had lost contact with defendant by age 12, and by failing to specify the nature of the disposition of one robbery allegation. The defense objection did not cite any of the

---

[11]To this point in her cross-examination, the prosecutor had erroneously referred to these juvenile adjudications as "convictions," whereupon the trial court sustained a defense objection to the use of that term.

constitutional grounds to which defendant's briefing now alludes, nor did it assert that this pattern of cross-examination questions and answers constituted nonstatutory aggravation. We therefore conclude that, apart from the contention that the trial court erred in permitting the prosecutor to inquire about the witness's awareness of defendant's juvenile "convictions," defendant failed to preserve for appeal the claims he now asserts.

Even were the claims cognizable, they would lack merit. Contrary to defendant's current argument, it is apparent that Roberts was indeed called as a character witness and accordingly testified that, as a child, defendant did not cause problems at the boys and girls club and wanted to stay in school and make his mother proud of him. The prosecution thus was entitled to rebut this evidence with other evidence "suggesting a more balanced picture of his personality" (*People v. Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113]), even if some of it fell outside the scope of section 190.3, factor (b) (evidence of criminal activity involving force or violence) or factor (c) (prior felony convictions) (*In re Ross* (1995) 10 Cal.4th 184, 209 [40 Cal.Rptr.2d 544, 892 P.2d 1287]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1072-1073 [5 Cal.Rptr.2d 230, 824 P.2d 1277]). The prosecutor's cross-examination of Roberts did no more than was proper.[12] Defendant also challenges on the same basis the cross-examination of his mother and other relatives. The direct testimony of defendant's mother (and other relatives) was, as defendant suggests, in part "foundational" as to his background and upbringing; but it also, in part, conveyed opinions about his character.

Defendant also suggests he was denied his constitutional rights by the prosecutor's cross-examination of defendant concerning his disciplinary violations while in pretrial custody, but he failed to preserve the claim by contemporaneous objection below. (*People v. Earp, supra,* 20 Cal.4th at p. 884.) The latter claim also lacks merit, as the particular cross-examination was proper to impeach defendant's direct testimony that, apart from the incident involving Elster and Oropeza, he had no problems in county jail. Contrary to defendant's assertion, therefore, the challenged evidence was not irrelevant, even had defendant not forfeited the claim by his failure to object on this ground at trial. (*Ibid.*) Because the cross-examination of which defendant complains was not improper, his derivative claim of ineffective assistance of counsel in failing to object (or to move for a *Phillips* hearing; see *People v. Phillips, supra,* 41 Cal.3d at p. 72, fn. 25) likewise lacks merit.

---

[12]With the exception of the erroneous references to juvenile "convictions," objection to which the trial court sustained.

### 3. *Restriction on argument concerning effect of execution on defendant's family members*

■ During closing argument, defense counsel sought to discuss the likely effect of defendant's execution on his family and friends. The trial court sustained the prosecutor's objection to this line of argument. Defendant contends the ruling violated his Eighth and Fourteenth Amendment rights to a reliable penalty determination, a fair trial and due process of law, in that it prevented the sentencer from considering and giving effect to evidence relevant to his background or character or to mitigating circumstances. (See *Penry v. Lynaugh* (1989) 492 U.S. 302, 318 [109 S.Ct. 2934, 2946-2947, 106 L.Ed.2d 256], citing *Eddings v. Oklahoma* (1982) 455 U.S. 104, 113-114 [102 S.Ct. 869, 876-877, 71 L.Ed.2d 1].) Defendant acknowledges our holding in *People v. Ochoa* (1998) 19 Cal.4th 353, 456 [79 Cal.Rptr.2d 408, 966 P.2d 442], that the jury must decide whether a defendant deserves to die, not whether the defendant's family deserves to suffer the pain of a member's execution, but may consider the positive qualities of his background or character that would be illuminated by the impact his execution would have upon his family. Defendant argues that counsel's argument fit within the parameters of *Ochoa* or, alternatively, that counsel rendered ineffective assistance in failing to make an offer of proof as to the specific qualities of defendant's background or character that would have been illuminated by the effects of his execution on his family.

We find no error in the trial court's ruling. Counsel's bare invitation to the jury to consider the likely effect of a death sentence on defendant's friends and family did not articulate a factor relevant to the jury's penalty determination. In view of counsel's numerous other references during his closing argument to the testimony concerning defendant's family and their mutual devotion to each other, moreover, defendant suffered no prejudice as a result of the ruling and thus was not deprived of the effective assistance of counsel.

### 4. *Alleged prosecutorial misconduct*

■ Defendant contends the prosecutor engaged in misconduct in cross-examining him during his penalty phase testimony concerning his extrajudicial statements to police, resulting in a denial of various constitutional rights. We conclude defendant has failed to preserve his claims, which in any event lack merit.

First, defendant contends the prosecutor improperly cross-examined him concerning his invocation of the right to counsel during custodial questioning. The issue arises in the following context: Prior to trial, the superior

court held a hearing on defendant's motion to preclude the prosecution from introducing into evidence his custodial statements to Detective Baird and Detective Duff on the ground such statements were obtained involuntarily in violation of his right to counsel, his privilege against self-incrimination and his right to due process. Detective Baird testified at this hearing that defendant was informed of, and expressly waived, all his rights before making his statement; Baird also testified he made no threats and promised nothing to defendant. Defendant then testified, denying he was informed of his rights and stating that although he repeatedly told the detectives he did not want to speak with them, they kept on "pressuring" him to talk. Ultimately, he agreed to give a statement when the detectives confronted him with statements by Lavera and Moore naming him as the triggerman. The trial court ruled that defendant had knowingly and voluntarily waived his constitutional rights and that his statements therefore were admissible.

The prosecutor did not introduce defendant's statements in her penalty phase case-in-chief. On direct examination, defendant testified about the Thompson and Salgado murders, admitting he intended to rob the victims but denying he intended to kill or actually killed them. Defendant also testified about his postarrest statements to police, stating he initially did not want to talk with them but changed his mind when he learned that Andre Moore had given a statement to the police; at that point, he testified, he "wanted the truth to come out." On cross-examination, defendant testified he could not recall the details of Moore's statement. The prosecutor asked: "Well, you indicate that Andre Moore made you the shooter in both incidents, both killings, is that correct?" Defense counsel objected on the ground the question misstated the evidence. The trial court sustained the objection and directed the prosecutor to lay a foundation. The prosecutor then asked defendant if he had testified on direct examination about having previously testified in the present case just before the trial began, and defendant acknowledged he had. The prosecutor asked whether, at that time, defendant was trying to establish that his postarrest statement was taken from him against his will. Defense counsel objected that the question misstated the evidence; the trial court sustained the objection, but refused to admonish the jury. The prosecutor proceeded to ask defendant if he had testified in the earlier hearing that he was "pressured" into talking to the police. Defendant replied: "I wouldn't call it pressured, but I told Detective Duff I would not talk to him unless a lawyer was present, and then he kept on asking me to talk to him. I kept on telling him no." In response to the prosecutor's further questioning, defendant denied saying the detectives "made" him talk, but acknowledged "[w]hen they showed me Andre Moore's statement, that's when I talked." Asked: "You were not going to talk to Detective Duff or Detective Baird without a lawyer; is that correct?" defendant responded

affirmatively. Asked: "And you insisted at the first hearing that you had not been given your rights; is that correct?" defendant likewise responded affirmatively. Defendant acknowledged that, during his postarrest interview, detectives showed him statements by Moore and Lavera, each to similar effect, identifying him as the shooter of Thompson and Salgado. The prosecutor asked: "And after you read those statements, that's when you decided to come clean and tell the truth; is that correct?" Defendant answered, "Yes." The prosecutor followed up: "This was after you had told Detective Duff that you had nothing to do with the shootings, you weren't even there, is that correct?" Defendant agreed.

Defendant complains that this line of questioning was directed at eliciting the irrelevant fact that, at a pretrial hearing, he claimed he had exercised his constitutional rights not to talk with police unless a lawyer was present. Citing *Fletcher v. Weir* (1982) 455 U.S. 603 [102 S.Ct. 1309, 71 L.Ed.2d 490] and *Doyle v. Ohio* (1976) 426 U.S. 610, 617-620 [96 S.Ct. 2240, 2244-2246, 49 L.Ed.2d 91], defendant urges that this cross-examination violated his Fifth Amendment rights. Defendant further contends that counsel's objection at the outset of the line of questioning (on the ground that the prosecutor was misstating the evidence) sufficiently preserved the issue for appellate review, and any further objection would have been futile because the trial court had already refused to admonish the jury. Moreover, according to defendant, the prosecutor's asserted misconduct was of such a serious nature that an admonition would not have cured the resulting harm.

We conclude that the claim defendant now raises was not preserved for appeal, as defense counsel's solitary objection at the outset of the line of questioning failed to specify the grounds he now urges. (See *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330].) We further find the requirement of specific contemporaneous objection was not excused under these circumstances, in that—assuming arguendo some impropriety in the prosecutor's questioning—defendant has failed to show that a prompt admonition to disregard the reference to his assertion of the right to counsel would not have cured any harm.

In any event, we conclude the challenged line of cross-examination did not constitute misconduct. Prosecutorial misconduct involves the use of deceptive or reprehensible methods in an effort to persuade the jury (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673] [misconduct violating state Constitution]) or actions so egregious as to infect the trial with unfairness (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199] [misconduct violating federal Constitution]). The prosecutor's aim apparently was to show that, contrary to defendant's assertion on direct examination that he "wanted the truth to come out,"

in fact defendant made his limited admissions of culpability only after he had learned that Moore and Lavera had named him as the actual killer of Thompson and Salgado. The initial defense objection to the questioning, on the ground that it misstated the evidence, prompted the trial court to request the prosecutor to "lay a foundation" for further questions concerning the circumstances under which defendant made his statement to police. As the Attorney General argues, in order to impeach defendant's direct testimony, the prosecutor thus needed to establish, as defendant's motivation for speaking with the police, his knowledge of the inculpatory statements by Moore and Lavera. The prosecutor's subsequent effort to lay such a foundation—by asking whether defendant had testified at the prior hearing for the purpose of establishing that his statements were involuntary—having drawn a successful objection (on the ground of misstating the evidence), she was then forced to resort to more specific questions regarding the reasons why defendant had testified in the prior hearing. For all that appears in this record, the subsequent questioning was thus an effort to comply with the trial court's ruling on the defense objection rather than any attempt to mislead the jury or to focus its attention on inadmissible matters. Moreover, the prosecutor's questioning did not, on its face, tend necessarily to elicit an answer mentioning a request for counsel, and in her closing argument the prosecutor never referred to that request.

In sum, we reject defendant's claim that the prosecutor improperly inquired into his assertion of his right to counsel. Consequently, we conclude his derivative claim of ineffective assistance of counsel in failing to object to the challenged inquiry lacks merit.

■ Defendant also contends the prosecutor engaged in misconduct in cross-examining him concerning Moore's and Lavera's extrajudicial statements, which assertedly constituted inadmissible hearsay, thereby depriving him of his constitutional right of confrontation under the principles set forth in *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] and *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476]. The misconduct, he asserts, denied him a fair trial, due process of law, and a reliable and fair penalty determination. Defendant acknowledges that his trial counsel failed to object to the questioning, but contends that because an admonition would not have cured the harm caused by the asserted misconduct the claim was not forfeited.

We conclude the challenged cross-examination did not constitute misconduct. First, we note the evidence of the statements did not, contrary to defendant's argument, come within the compass of the *Aranda-Bruton* principles, which apply in the case of a statement inculpating the defendant

made by a nontestifying codefendant at a *joint* trial. (*People v. Harris* (1989) 47 Cal.3d 1047, 1070 & fn. 8 [255 Cal.Rptr. 352, 767 P.2d 619], disapproved on other grounds in *People v. Wheeler* (1992) 4 Cal.4th 284, 299, fn. 1 [14 Cal.Rptr.2d 418, 841 P.2d 938].) Second, the evidence did not constitute inadmissible hearsay: The prosecutor's apparent aim in inquiring into defendant's knowledge of Moore's and Lavera's statements was not to establish the truth of the matters asserted therein but to shed light on defendant's state of mind in admitting his own involvement in the Thompson and Salgado offenses and the credibility of his trial testimony that his admission was motivated by a desire to bring forth the truth.[13] (See *Tennessee v. Street* (1985) 471 U.S. 409, 414 [105 S.Ct. 2078, 2081-2082, 85 L.Ed.2d 425] [nonhearsay use of codefendant's confession raised no confrontation clause concerns].) Finally, even assuming prosecutorial misconduct in cross-examining defendant and mentioning in summation Moore's and Lavera's statements, we find no prejudice because it is not reasonably possible the misconduct affected the death judgment, given the circumstances of the capital offenses and the other evidence in aggravation. Significantly, the jury's ability to focus on the particular facts of each of the two murders appears to have been unimpeded by the claimed misconduct, as shown by its verdict of life without possibility of parole for the Salgado murder.

### 5. *Ineffective assistance of counsel*

Defendant contends his trial counsel rendered ineffective assistance in failing to object to the introduction of his statements to Deputy Plass made during an interview concerning the jailhouse assault. Because that interview was conducted without notice to the attorneys representing defendant in connection with his then pending capital charges, defendant argues it violated his Sixth Amendment right to counsel, as recognized in a line of cases beginning with *Massiah v. United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 121 L.Ed.2d 246], and the incriminating statements he made in the course thereof should have been suppressed on a timely objection. Despite the general rule that the failure to object is a matter of trial tactics that an appellate court will seldom second-guess (*People v. Farnam* (2002) 28 Cal.4th 107, 201 [121 Cal.Rptr.2d 106, 47 P.3d 988]), here, he contends, there could be no satisfactory explanation for the failure to object. Consequently, defendant reasons, and because the statements prejudiced him, the penalty judgment should be reversed.

---

[13]The nonhearsay purpose of the questioning may be said to have been somewhat undermined by the prosecutor's later comment, in her closing argument, that in order to believe defendant the jury would "have to disbelieve Andre Moore's statement to the police where he said that Tracey Carter was the guy who shot the preacher and who shot Mr. Salgado. [¶] You have to disregard Todd Lavera's indication to the same effect to the police that Tracey Carter was the one that killed both of these men." Nonetheless, the defense made no objection and sought no limiting instruction.

We disagree. Because an objection on Sixth Amendment grounds to the introduction of defendant's statements would have lacked merit, counsel were not ineffective in failing to object. (*People v. Thomas* (1992) 2 Cal.4th 489, 531 [7 Cal.Rptr.2d 199, 828 P.2d 101].) The Sixth Amendment right to counsel is offense specific, attaches at the institution of judicial proceedings, and may be waived. (*McNeil v. Wisconsin* (1991) 501 U.S. 171 [111 S.Ct. 2204, 115 L.Ed.2d 158]; *Patterson v. Illinois* (1988) 487 U.S. 285 [108 S.Ct. 2389, 101 L.Ed.2d 261].) While it is true that when defendant was interviewed by Deputy Plass, counsel had already been appointed to represent him in his capital case, Plass did not question him about the capital case but rather about the as yet uncharged assault. Before questioning defendant, Plass recited the standard *Miranda* advisements, including that any statement defendant made could be used against him in a court of law. (*Miranda, supra*, 384 U.S. 436.) Defendant then waived his Fifth Amendment right to the presence of counsel during questioning. It is true that the high court in *Patterson v. Illinois* found it significant that the defendant in that case had not retained or accepted the appointment of counsel at the time he was questioned, noting, "Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." (*Patterson v. Illinois, supra*, at p. 290, fn. 3 [108 S.Ct. at p. 2393].) We do not, however, understand the high court to have mandated that counsel previously appointed or retained in an unrelated case be notified whenever jail authorities seek to question an inmate about possible criminal acts committed while in custody. Defendant insists that the rule he advocates would pose no interference with such investigations because the prosecution could simply refrain from introducing a defendant's statements obtained during such questioning. Defendant, however, minimizes the consequences to law enforcement of such a rule. Statements made by incarcerated defendants to jail authorities in a wide variety of contexts might be highly relevant to criminal proceedings, and it would be impractical to surround each of them with the full panoply of counsel rights, on pain of the loss of such evidence.[14] For present purposes, however, suffice it to say that the *Massiah* rule (*Massiah v. United States, supra*, 377 U.S. 201) was not violated here, where defendant was not questioned about the charged offenses and was offered (and waived) the assistance of counsel before any questioning concerning the jailhouse stabbing, as to which adversary proceedings had not commenced.

---

[14]For example, jail medical personnel might query an inmate awaiting trial about claimed psychiatric symptomatology in the course of assessing a need for medication, and the inmate's statements might be relevant in a number of respects to issues concerning his or her trial or sentence. In such a situation, jail personnel might legitimately need to converse with a defendant, without engaging in interrogation about his or her charged offense, and it would be impracticable to require that counsel be advised and given the opportunity to participate in every such instance.

Defendant further contends his trial counsel rendered ineffective assistance in permitting certain aggravating evidence to emerge during the penalty phase. He contends that, in fact, by virtue of counsel's acts and omissions, the jury heard more damaging evidence during the defense portion of the penalty phase than it did during the prosecution's case in aggravation. Enumerating various instances in which defense witnesses were cross-examined regarding their knowledge of defendant's juvenile offenses and incarcerations, and citing Dr. Maloney's findings regarding defendant's lack of significant mental disturbance and antisocial personality disorder, as well as defendant's own testimony confessing his knowledge of his confederates' intention to commit robbery on the occasion of each of the capital offenses, defendant contends counsel's penalty phase performance prejudiced him.

In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839].) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. (*Strickland v. Washington, supra*, at p. 687 [104 S.Ct. at p. 2064]; *In re Andrews* (2002) 28 Cal.4th 1234, 1253 [124 Cal.Rptr.2d 473, 52 P.3d 656].) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus. (*Id.* at pp. 266-267.)

Defendant falls short of meeting this demanding standard, for he fails to persuade us that reasonably competent counsel would not have presented the testimony of friends and family members regarding defendant's background and upbringing, his original good character, and their wish that his life be spared, even though such testimony necessarily would be tested on cross-examination with questions pertaining to his juvenile misconduct. As the Attorney General argues, trial counsel appear to have

sought, in the penalty phase, both to humanize their client by portraying him to have been a young person of good morals who fell into bad ways as a result of a limited intellect, immature character and bad environment, and to raise a lingering doubt whether he was the actual killer of Thompson and Salgado. To have chosen not to present the testimony of family members and friends in mitigation would have left this penalty phase jury with little from which to generate sympathy for defendant. Not to have put Dr. Maloney on the stand—given his findings that defendant had no impairment in reality testing and no major mental disturbance, but that a personality test did reveal what today would be termed antisocial personality traits—might well have been a reasonable professional judgment, but we cannot say that counsel's decision to use Dr. Maloney was unreasonable when his testimony regarding defendant's low intelligence, limited ego strength and hypomanic traits provided some support for an inference that defendant did not possess the mental wherewithal to act as anything but a follower in the Thompson and Salgado offenses. Defendant's own testimony reinforced this inference.

Finally, the fact that Associate Counsel De Blanc did not attend every court session or bill every hour of each working day to this case has no tendency to establish either deficient performance or prejudice, and thus does not further defendant's claim of ineffective assistance.

In sum, defendant fails to show, on this record, that trial counsel rendered ineffective assistance in presenting the penalty phase evidence they did, or in failing to object to the admission of other evidence. Defendant's other claims of ineffective assistance of counsel, in failing to object to certain evidence, or to request or submit certain jury instructions, are discussed in connection with the other claims of error to which they relate.

### 6. *Jury issues*

#### a. *Jury inquiry*

During the presentation of the defense case in mitigation, the jury sent the trial court a note asking for answers to four questions: "1. How important is our decision on this portion of the trial? 2. Does the decision have to be unanimous? 3. Are we rendering an opinion or a decision? 4. What would happen if we are unable to agree unanimously?" Upon receiving the note, the trial court called counsel for both parties into chambers, read them the note, and proposed "to tell them . . . that they are not to discuss the case among themselves, period. That we are still in the process of presenting evidence to them. [¶] That after the evidence is presented there will be argument by both sides. Then they will be instructed on the law. [¶] At that time they will go

back into the jury room, select a foreperson, and deliberate. And that's it." Both counsel agreed to the court's proposal.

At the conclusion of the in camera session, the court advised the jury: "I'd like to admonish you as to certain things. [¶] One, you should not be discussing this portion of the case. [A juror interjected: "We weren't."] At this time, period." The court continued: "Two, this case, this phase of the case will essentially be similar to the first phase. [¶] In other words, you are hearing evidence right now. Counsel will argue. After all of the evidence is presented. [¶] And then I am going to give you final instructions. After you get those instructions, then you will go back into the jury room and re-deliberate and come back with a decision. [¶] So, you should not be discussing this case among yourselves or anything of that nature until the case is finally submitted to you for your decision."

At the conclusion of the evidentiary portion of the penalty phase, the trial court instructed the jury with, inter alia, CALJIC No. 8.88, charging the jury with the duty to determine unanimously which of the two penalties, death or life imprisonment without possibility of parole, should be imposed on defendant. As requested by the defense, the trial court also instructed the jury in the following terms: "You are to presume that if a defendant is sentenced to life without the possibility of parole, he will spend the rest of his life in state prison. [¶] You are to presume that if a defendant is sentenced to death, he will be executed in the gas chamber."

■ Defendant now contends that the trial court, upon receipt of the note, was obliged to dispel the jury's confusion by immediately providing specific answers to its questions. Defendant further contends that the trial court's eventual penalty phase instructions did not fully address those questions and that its failure to do so deprived him of his rights to due process and a reliable and fair sentence. (See *Caldwell v. Mississippi* (1985) 472 U.S. 320, 328-329 [105 S.Ct. 2633, 2639-2640, 86 L.Ed.2d 231] [to suggest to the jury that responsibility for determining the appropriateness of the death penalty lies elsewhere violates the Eighth Amendment to the federal Constitution].)

We find no error. At the point during the trial when the jury submitted the note, its duty, as the trial court correctly advised, was to refrain from discussing the case. Had the trial court done otherwise, it would have risked diverting jurors from their immediate responsibility to attend to the evidence. Later, as the case was submitted to the jury, the trial court properly instructed jurors that their determination had to be unanimous and that they were to presume their determination would be carried out, thus disabusing

them of any possible belief their decision was unimportant. (See *People v. Kipp* (1998) 18 Cal.4th 349, 378-379 [75 Cal.Rptr.2d 716, 956 P.2d 1169] [jury should be instructed to assume the chosen penalty will be carried out when reason exists to believe the jury harbors some concern or misunderstanding in this regard].) Contrary to defendant's argument, the trial court was not required to advise the jury of the legal consequences of a failure to reach a verdict. (*People v. Hines* (1997) 15 Cal.4th 997, 1075 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193-1194 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Unlike in *Caldwell v. Mississippi, supra,* 472 U.S. 320, nothing said to the jurors in this case implied any diminution of responsibility for the penalty determination. Absent any error in the trial court's response, defendant's derivative claim of ineffective assistance of counsel in the failure to demand that the court specifically address the jury's inquiries likewise must fail.

### b. *Trial court's failure to advise counsel of jury inquiries*

Defendant contends the trial court violated his constitutional rights to a fair trial, the effective assistance of counsel, a reliable penalty determination, and due process of law, by failing to inform his counsel of certain requests made by the jury during its penalty phase deliberations. As explained below, we conclude defendant has not shown entitlement to relief on this record.

The jury retired to begin its penalty deliberations around 3:16 p.m. on November 20, 1989. Counsel asked to be advised of any request for a readback of testimony, and the court agreed. At some point that afternoon, the jury handed two notes to the bailiff. The jury was then excused at 4:10 p.m. The clerk's transcript for the following day (November 21) records that "at 3:45 p.m. the court receives question from the jury. The court responds via the bailiff to question submitted." The reporter's transcript, however, contains no record of any proceedings related to the jury's "question" on November 21.[15]

Observing that the jury's written notes requested material alluded to in cross-examination of defense witnesses but never admitted into evidence,[16] defendant argues that the trial court's apparent failure to inform counsel of

---

[15]Thereafter, the only discussion in open court of a jury question occurred on November 27, 1989, when the jury sent the judge a note asking what would happen if they failed to agree unanimously and commenting that they appeared to be deadlocked, and the judge thereupon discussed the question with counsel and called the jury in to respond.

[16]Namely, a notebook containing details of defendant's juvenile record (erroneously referred to as defense exhibit F). Defendant does not assert the jury was in fact given this notebook.

its receipt of the notes constituted a prejudicial irregularity that prevented the defense from asking the court to redirect the jury's focus back to admissible evidence. The Attorney General does not contest that the trial court had a constitutional and statutory obligation to notify counsel and give them an opportunity to respond before answering the jury's notes. (§ 1138; *Rushen v. Spain* (1983) 464 U.S. 114, 119 [104 S.Ct. 453, 456, 78 L.Ed.2d 267]; *People v. Hawthorne* (1992) 4 Cal.4th 43, 68-69 [14 Cal.Rptr.2d 133, 841 P.2d 118].) He suggests, however, that—absent any contrary indication in the record—we should assume the court followed established law by contacting trial counsel and affording them an opportunity to respond before communicating with the jury. (Evid. Code, § 664 [presumption that official duty is regularly performed]; see *People v. Diaz* (1992) 3 Cal.4th 495, 567 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) The Attorney General points out that in their postverdict briefing, defendant's attorneys referred to the jury's requests without suggesting they had not received proper and timely notice thereof. The Attorney General further contends that, as the record does not contain the substance of the judge's response to the jury, this court should presume she responded appropriately. (Evid. Code, § 664; *U.S. v. Throckmorton* (9th Cir. 1996) 87 F.3d 1069, 1072-1073.) We agree. Defendant bore the burden of developing a record sufficient to ensure review of his claim, as by settled statement (*People v. Osband* (1996) 13 Cal.4th 622, 663 [55 Cal.Rptr.2d 26, 919 P.2d 640]), and nothing in the present record suggests that any irregularity in these proceedings prejudiced him (*People v. Delgado* (1993) 5 Cal.4th 312, 330-332 [19 Cal.Rptr.2d 529, 851 P.2d 811]).

c. *Alleged misconduct*

 Defendant contends the trial court erred in failing to hold a posttrial evidentiary hearing in the face of evidence that several jurors engaged in misconduct. The error, he claims, violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and analogous state constitutional provisions. The issue arose in the following context:

After the jury returned its penalty verdict, trial counsel spoke to several of the jurors. Counsel wondered how the jury had come to a decision, since the previous day the jury had indicated it was having difficulty doing so. One juror (who counsel initially believed was Juror B. but later concluded was Juror H.) commented he had taken another juror (who counsel believed was Juror M.) out to dinner. From the juror's comment, counsel inferred that one or more jurors had violated the admonition against discussing the case except when all jurors were present. Accordingly, counsel moved for a new penalty trial on the ground that defendant was denied a fair and impartial jury.

Seeking factual support for the motion, the defense interviewed several of the jurors, employing a five-page questionnaire designed to elicit information about possible juror misconduct. Jurors M. and B. declined to answer the questionnaire. Juror B. told the investigator he had "spent enough time on the Carter case and that he did as was instructed by [the] court." Juror M. informed the investigator that she had contacted her attorney and the court clerk, and was informed she did not have to speak with the defense and, if she did, a court officer or the district attorney had to be present; to the investigator she "appeared to be somewhat adamant" and said she did not wish the defense to contact her further. Under penalty of perjury, Juror H. generally denied any misconduct on the part of any juror and specifically denied discussing the case during the period when the jury was deliberating, with any other juror or jurors when the entire jury was not present. In response to the question "If you did not initially intend to vote for death, what changed your mind?" Juror H. answered: "What change[d] my mind to vote for the death penalty was when the court reporter came in and read the transcrip[t]s, the evidence." Defense Counsel De Blanc, under examination by Cocounsel Alexander, testified that in the postverdict conversation when he had asked Juror H., "How was it that they had such difficulty and changed their position," Juror H. had said: " 'It [was] extremely difficult, we had a very hard time.' [¶] Then he said, 'I had to take a certain person'—and he said something that caused me to believe it was Miss [M.] 'I had to take a certain person to dinner to get her straightened out.' " The court interjected: "To straighten her out?" De Blanc replied, "Something to that effect." Jurors M. and H. were subpoenaed and available when the parties argued the question whether the defense had made a sufficient showing to compel them to submit to examination. The trial court, however, found the defense showing to be too speculative to warrant putting the jurors on the stand and denied the motion. Defendant contends this ruling constituted error.

 We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct. (*People v. Williams* (1997) 16 Cal.4th 635, 686 [66 Cal.Rptr.2d 573, 941 P.2d 752]; *People v. Cox* (1991) 53 Cal.3d 618, 694 [280 Cal.Rptr. 692, 809 P.2d 351].) When a trial court is aware of possible juror misconduct, it must make whatever inquiry is reasonably necessary, but "only when the defense comes forward with evidence that demonstrates 'a strong possibility' of prejudicial misconduct." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1255 [91 Cal.Rptr.2d 211, 989 P.2d 645], quoting *People v. Hedgecock* (1990) 51 Cal.3d 395, 419 [272 Cal.Rptr. 803, 795 P.2d 1260].) "Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." (*Hedgecock, supra,* at p. 419.) "Normally, hearsay is not

sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct." (*Hayes, supra,* at p. 1256.)

In *Hayes,* the defendant, in a motion for new trial, offered to submit both a juror's unsworn statement and the defense investigator's affidavit recounting the juror's statement to him concerning reading newspaper articles about the defendant during the trial. The juror refused to submit that statement under oath and later made an unsworn denial of having made the statement. (*People v. Hayes, supra,* 21 Cal.4th at pp. 1253-1255.) We found no abuse of discretion in the trial court's denial of the new trial motion without a hearing, noting that the court was justified in according little, if any, credence to the hearsay assertions the juror would not verify. (*Id.* at p. 1256.)

Similarly, in *Cox,* in connection with a motion for new trial, the defense obtained an unsworn statement from a juror (as well as the defense investigator's affidavit verifying the juror's statement) that the jury received and considered a letter that was not admitted into evidence in the case. We held that the trial court did not abuse its discretion in refusing to conduct an evidentiary hearing because it was entitled to accord little, if any, credence to assertions that the juror herself was unwilling to verify. We stated: "[T]he trial court was confronted not with conflicting evidence but one juror disinclined, for whatever reason, to aver under penalty of perjury statements she assertedly had made to a defense investigator. Moreover, the representations of counsel did not suggest 'a strong possibility that prejudicial misconduct ha[d] occurred.' [Citation.] Without some elaboration of the context in which the reference to the . . . letter . . . arose, the court had no basis for concluding the jury actually considered *evidence* not received at defendant's trial." (*People v. Cox, supra,* 53 Cal.3d at p. 698, fn. omitted.)

The facts before us present an even more compelling case for denial of an evidentiary hearing. The showing here consisted of sworn statements by Juror H. that (1) generally denied the occurrence of any misconduct, and (2) specifically denied that he had discussed the case with any other juror or jurors when the entire jury was not present. There was no evidence from the other juror allegedly involved. Not only were Juror H.'s sworn statements uncontradicted, but even the defense investigator who interviewed Juror H. reported that Juror H. appeared very sincere. True, defense counsel testified that Juror H. stated, during a conversation relating to the jury's deliberations, "[s]omething to th[e] effect" that "I had to take a certain person to dinner to get her straightened out." But counsel's testimony lacked specifics and was based on hearsay; thus, it presented no material conflict requiring an evidentiary hearing, and it matters not that Juror H. and another juror had been subpoenaed in anticipation of such a hearing.

With respect to the suggestion that Juror H. prejudged the determination of penalty because he stated he was ultimately moved to vote for death by a readback of testimony, which apparently occurred only during the guilt phase, on this record we conclude the trial court did not abuse its discretion in refusing the defense request for an evidentiary hearing. While the reporter's transcript does not reflect that the court reporter was ever directed to enter the jury deliberation room during the jury's penalty deliberations for a readback of testimony, the clerk's transcript does include two notes that the jury submitted to the trial court on the first day of its deliberations requesting various items of evidence (defendant's "confession of his involvement in the Thompson and Salgado murders and the attack on the 2 inmates in the Honor Row"), written jury instructions and certain documentary evidence.[17] The record does not clearly set forth how the trial court responded to the notes; the reporter's transcript is silent on the matter, and the clerk's transcript merely states that the court received a "question" from the jury and responded "via the bailiff to the question submitted." It may be that Juror H. in his questionnaire was referring, albeit somewhat imprecisely, to this request for evidence. Juror H. also referred generally, in his questionnaire response, to "the evidence" as motivating his verdict; he may have been referring to his recollection, during deliberations, of the testimony read back during the guilt phase. Defendant never asked the trial court to inquire further, and any such inquiry into the motivation for the juror's vote for a death verdict would, in any case, conflict with Evidence Code section 1150, subdivision (a), which renders inadmissible any evidence concerning the mental processes by which a verdict is determined.

### 7. Instructional issues

#### a. Failure to reinstruct jury at penalty phase

At the conclusion of the penalty phase, the trial court instructed the jury with CALJIC No. 8.84.1, as follows in pertinent part: "You are now being instructed as to all of the law that applies to the penalty phase of the trial. [¶] You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. You must accept and follow the law that I shall state to you. Disregard all other instructions given to you in other phases of this trial." The court proceeded to instruct the jury with CALJIC Nos. 8.85, enumerating the factors for the jury's consideration in determining defendant's penalty, 8.86, requiring proof beyond a reasonable doubt of a prior conviction offered in aggravation, 8.87, requiring

---

[17] That is, Dr. Maloney's reports, "disciplinary reports" pertaining to defendant during his recent incarceration, the record of defendant's "cocaine arrest," and defendant's juvenile record.

such proof of other criminal activity offered in aggravation, 2.90, covering the presumption of innocence and defining the burden of proof beyond a reasonable doubt, 17.47, admonishing against disclosure of the jury's balloting, 17.48, pertaining to a juror's use of notes, and 8.88, setting forth the concluding instructions for the penalty phase.[18] Contrary to the recommendation contained in the Use Note to CALJIC No. 8.84.1, however, the trial court did not instruct the jury with applicable evidentiary instructions from CALJIC Nos. 1.00 through 3.31.[19]

As defendant points out, the trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) Among the instructions omitted here were several that previous decisions have held to be required in all criminal cases, including CALJIC Nos. 2.20 on the credibility of a witness, 2.22 on weighing conflicting testimony, 2.80 on expert testimony, and 3.11 and 3.12 pertaining to accomplice testimony and corroboration thereof. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]; *People v. Ruiz* (1970) 11 Cal.App.3d 852, 864-865 [90 Cal.Rptr. 110]; see § 1127b.) Defendant contends the omission of standard evidentiary instructions in his case violated his Fifth, Eighth and Fourteenth Amendment rights to due process, a fair and reliable trial, and a reliable penalty determination, and requires reversal of the death judgment.

In opposition, the Attorney General argues that (1) no reasonable jury would have taken literally the instruction to disregard all guilt phase instructions, (2) the trial court had no sua sponte duty to give such evidentiary instructions in the penalty phase, and (3) any error in the omission of these instructions was harmless under state and federal standards of review.

The Attorney General's first contention appears to conflict with the oft-stated presumption that the jury does as it is instructed to do. (E.g.,

---

[18]The court also gave the jury two instructions proposed by defendant, one stating a presumption that a defendant sentenced to life without possibility of parole will spend the rest of his life in prison and a defendant sentenced to death will be executed, and the other based on CALJIC No. 17.30, instructing the jury not to take any cue from the judge.

[19]This case is thus distinguishable from *People v. Wharton* (1991) 53 Cal.3d 522, 600 [280 Cal.Rptr. 631, 809 P.2d 290], and *People v. Daniels* (1991) 52 Cal.3d 815, 884-885 [277 Cal.Rptr. 122, 802 P.2d 906], where the trial court failed to reinstruct the jury at the penalty phase with certain evidentiary instructions given at the guilt phase, but did not direct the jury to disregard the earlier instructions, or *People v. Cooper* (1991) 53 Cal.3d 771, 846 [281 Cal.Rptr. 90, 809 P.2d 865], where the trial court affirmatively instructed the jury to apply all of the guilt phase instructions, "except as hereinafter provide[d]," and further instructed that "in deciding the appropriate penalty you may consider pity, sympathy or mercy for the defendant."

*People v. Sanchez* (1995) 12 Cal.4th 1, 79 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People v. Bonin* (1988) 46 Cal.3d 659, 699 [250 Cal.Rptr. 687, 758 P.2d 1217], overruled on another point in *People v. Hill, supra,* 17 Cal.4th at p. 823.)

■ The Attorney General's second contention, if accepted, would mark an extension of principles announced or reiterated in such decisions as *People v. Livaditis* (1992) 2 Cal.4th 759, 782-784 [9 Cal.Rptr.2d 72, 831 P.2d 297], *People v. Memro* (1995) 11 Cal.4th 786, 881 [47 Cal.Rptr.2d 219, 905 P.2d 1305], and *People v. Holt* (1997) 15 Cal.4th 619, 682-684 [63 Cal.Rptr.2d 782, 937 P.2d 213]. In *Holt,* referring to a claim of error in the failure to instruct on the standard for resolving factual disputes as to the existence of aggravating and mitigating factors, we reasoned that "because capital sentencing is a moral and normative process, it is not necessary to give instructions associated with the usual factfinding process." (*Holt, supra,* at p. 684.) *Memro* followed earlier decisions in rejecting a claim that the trial court erred in failing to instruct the penalty phase jury as to the elements of unadjudicated offenses shown by the evidence, inasmuch as the defense might not wish to have the jury's attention unduly focused on those crimes. (*Memro, supra,* at p. 881.) *Livaditis,* more specifically, concluded that the instruction to view a defendant's admissions with caution need not be given sua sponte in the penalty phase. (*Livaditis, supra,* at p. 784.) In that case we reasoned: "At a penalty phase, the distinction between mitigation and aggravation is often more blurred than the distinction between a statement that incriminates and one that does not. A statement, for example, that the defendant is sorry he stabbed the victim to death is both mitigating and aggravating. It admits guilt but also expresses remorse. It is unclear whether the defense would desire the court to tell the jury to view such a statement with caution. Therefore, the guilt-phase sua sponte duty should not apply to the penalty phase. The cautionary instruction need be given at a penalty phase only upon request." (*Ibid.*) Observing that the effect in this case of omitting such instructions as CALJIC Nos. 1.02, concerning statements of attorneys, and 2.80, concerning expert testimony, might have been to cabin less strictly the jury's consideration of mitigating evidence, or to avoid an unfavorable focus on the aggravating evidence, and thus may actually have benefited defendant, the Attorney General urges us to adopt the rule that evidentiary instructions need be given only upon request in the penalty phase.

■ We need not adopt the proposed rule in order to resolve defendant's claim, for he fails to demonstrate that the omission of the evidentiary instructions here resulted in prejudice. For example, although in the absence of CALJIC No. 1.02 the jury assertedly might, as defendant contends, have

considered in aggravation information about defendant's juvenile record that was not admitted in evidence but was merely employed in cross-examining defense witness Roberts, by the same token the jury also might have considered conditions of confinement mentioned in defense counsel's closing argument urging a verdict of life without parole. And, in the absence of CALJIC No. 2.80, which informs the jury it is not bound by expert testimony but may accord such testimony whatever weight the jury feels it deserves, the Attorney General suggests the jury was likely to have accorded greater rather than lesser weight to the testimony of the defense expert, Dr. Maloney. Whether or not the suggestion is valid, we see no reason to assume, as defendant apparently does, that in the absence of the instruction the jury must have "totally disregarded" Dr. Maloney's testimony. Notwithstanding defendant's complaint that the jury was left "in the complete dark" as to how to evaluate Maloney's testimony and that of other witnesses, the jury expressed no confusion or uncertainty in this regard and never requested clarification. Although, as defendant points out, circumstantial evidence of his unadjudicated crimes was introduced in the penalty phase, he fails to suggest how the jury, lacking CALJIC Nos. 2.00 and 3.01, might have misunderstood or misused that evidence. Similarly, defendant demonstrates that various other evidentiary instructions were applicable on the facts of this case, but he does no more than speculate that their absence somehow prejudiced him. Under the applicable test of a claim that the failure to instruct a sentencing jury deprived a defendant of rights under the Eighth and Fourteenth Amendments to the federal Constitution, defendant fails to demonstrate that the instructions given in his case, to a reasonable likelihood, precluded the sentencing jury from considering any constitutionally relevant mitigating evidence. (*Buchanan v. Angelone* (1998) 522 U.S. 269, 276-278 [118 S.Ct. 757, 761-763, 139 L.Ed.2d 702]; *Boyde v. California* (1990) 494 U.S. 370, 380 [110 S.Ct. 1190, 1192-1198, 108 L.Ed.2d 316].) Contrary to defendant's argument, the lack of evidentiary instructions here did not constitute structural error as defined in *Arizona v. Fulminante* (1991) 499 U.S. 279, 309-310 [111 S.Ct. 1246, 1264-1265, 113 L.Ed.2d 302]: it did not deprive defendant of " 'basic protections' [such as an unbiased judge, an impartial jury, or the assistance of counsel] without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence [or punishment] . . . and no criminal punishment may be regarded as fundamentally fair.' " (*Neder v. United States* (1999) 527 U.S. 1, 8-9 [119 S.Ct. 1827, 1833, 144 L.Ed.2d 35], quoting *Rose v. Clark* (1986) 478 U.S. 570, 577-578 [106 S.Ct. 3101, 3105-3106, 92 L.Ed.2d 460].)

Thus, assuming error in the trial court's failure to reinstruct the jury with evidentiary instructions in the penalty phase, defendant fails, under the state standard of review, to establish a reasonable possibility that the error affected the verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 446-448 [250

Cal.Rptr. 604, 758 P.2d 1135].) Under the federal standard of review of constitutional error, it appears beyond a reasonable doubt that the assumed error did not contribute to the death verdict. (*Chapman v. California, supra,* 386 U.S. at p. 24 [87 S.Ct. at p. 828].) Having thus found no prejudice in the omission of evidentiary instructions, we likewise reject defendant's claim of ineffective assistance of counsel in failing to request them.

Despite the absence of prejudice in this case, we strongly caution trial courts not to dispense with penalty phase evidentiary instructions in the future. The cost in time of providing such instructions is minimal, and the potential for prejudice in their absence surely justifies doing so.

b. *Instruction to render separate penalty verdicts for each murder count*

█ Before the commencement of its penalty deliberations, the trial court submitted to the jury separate verdict forms for each of the two murder convictions. The jury returned a verdict of life without parole for the Salgado murder and death for the Thompson murder. Defendant now contends the use of separate verdict forms abrogated the jury's ultimate responsibility to determine the appropriate punishment and risked placing undue emphasis on the characteristics of the individual victims, thus violating his state and federal constitutional rights to due process and equal protection of the law, a fair trial, and a reliable penalty determination. Defendant acknowledges we resolved the same arguments unfavorably to him in *People v. Sandoval* (1992) 4 Cal.4th 155, 197 [14 Cal.Rptr.2d 342, 841 P.2d 862], but asks us to reconsider that decision. He offers no persuasive reason for departing from our prior holding on this point, and we therefore decline to do so.

c. *Failure to instruct with CALJIC No. 3.18*

█ Defendant contends the trial court violated his state and federal constitutional rights to a fair trial, a reliable penalty determination and due process of law in failing to instruct the jury on its own motion, pursuant to CALJIC No. 3.18, to view the testimony of an accomplice with care and caution.[20] In cross-examining defendant during his penalty phase testimony, the prosecutor elicited the fact that Andre Moore had told the police that

---

[20]At the time of trial, CALJIC No. 3.18 provided: "The testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case." (CALJIC No. 3.18 (5th ed. 1988).) In 1999, the first sentence of the instruction was revised to provide: "To the extent that an accomplice gives testimony that tends to incriminate the defendant, it

defendant was the person who shot and killed David Thompson, and that Todd Lavera had told the police that defendant had fired the shots that killed Leopoldo Salgado. In both the guilt and penalty phases of trial, the court ordinarily must instruct the jury sua sponte with CALJIC No. 3.18 when out-of-court statements to police by accomplices are admitted into evidence. (*People v. Mincey* (1992) 2 Cal.4th 408, 461 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People v. Andrews* (1989) 49 Cal.3d 200, 214 [260 Cal.Rptr. 583, 776 P.2d 285].) We have recognized an exception, however, when the penalty phase accomplice testimony relates to an offense of which the defendant has already been convicted. (*People v. Easley* (1988) 46 Cal.3d 712, 734 [250 Cal.Rptr. 855, 759 P.2d 490]; *People v. Williams, supra,* 16 Cal.4th at p. 276.) In such circumstances, we reasoned, a jury has already found the defendant guilty beyond a reasonable doubt of the offense and thus no further cautionary instruction is required as to that offense. (*Easley,* at p. 734; *Williams,* at p. 276.)

The same rationale applies here, for the jury in this case had already convicted defendant of the Thompson and Salgado murders when it heard the accomplice statements through defendant's cross-examination testimony. Defendant urges that the *Easley* exception should not govern here. That is, he contends that although the jury had already determined his guilt of murder, an unresolved penalty phase issue was the extent of his culpability as either the actual killer or, as he maintained, merely an aider and abettor. We disagree. The jury's guilt phase verdict not only found defendant guilty of murder; it found beyond a reasonable doubt that he had personally used a deadly weapon. As in *People v. Williams, supra,* 16 Cal.4th 153, and *People v. Easley, supra,* 46 Cal.3d 712, the cautionary instructions were not required.

Defendant makes the related contention that his trial counsel rendered ineffective assistance in failing to request that the jury be instructed to view the extrajudicial statements of Lavera and Moore with care and caution. The claim fails in the context of this direct appeal because the record does not reveal whether counsel had a plausible tactical reason for not requesting the instruction, such as to avoid unduly focusing the jury's attention on those statements. (*People v. Mendoza Tello, supra,* 15 Cal.4th at p. 266.) In any event, it is not reasonably probable that the giving of such an instruction would have led to a more favorable outcome, given the weight of the aggravating evidence and the jury's guilt phase findings that defendant personally used a deadly weapon in committing the murders.

d. *Refusal to instruct jury not to consider deterrence or cost*

Defendant argues the trial court violated his Fifth, Eighth and Fourteenth Amendment rights to a fair trial, due process and a reliable

should be viewed with caution." (See *People v. Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928].)

penalty verdict, and analogous state constitutional rights, by refusing a proposed defense instruction that would have directed the jury not to consider the issues of deterrence or cost in choosing whether to impose the death penalty. The trial court did not err. While the proposed instruction was legally correct, defendant points to nothing in the record expressly or impliedly raising these issues. (*People v. Benson, supra*, 52 Cal.3d at p. 807.) As we said in *People v. Welch* (1999) 20 Cal.4th 701, 766 [85 Cal.Rptr.2d 203, 976 P.2d 754]: "While instructing the jury on this point may be appropriate in some cases, it was not error for the trial court to refuse such an instruction. The jury was adequately informed that it was supposed to limit itself to the statutory aggravating and mitigating circumstances in making its penalty determination. The prosecutor never attempted to comment or introduce evidence regarding issues of cost and deterrence. The trial court was not required to furnish an instruction exhorting the jury to refrain from considering factors which, under a reasonable understanding of the jury instructions, it should have known were improper to consider." We disagree with defendant's contention that the refusal of this proposed instruction precluded trial counsel from arguing the concepts encompassed in it.

> e. *Refusal to instruct that the jury could take into account punishment received by coperpetrators*

 Defendant requested, and the trial court refused, a proposed instruction that would have directed the jury to consider the sentences received by separately tried coperpetrators Lavera and Moore.[21] Acknowledging we have previously held that a codefendant's sentence is irrelevant to the jury's penalty determination (see, e.g., *People v. Hines, supra*, 15 Cal.4th at p. 1068), defendant urges us to reconsider the issue. We decline to do so for, as the People point out, defendant fails to cite any new legal developments— for example, scholarly criticism, contrary decisions of sister state courts, or

---

[21]Defendant's proposed jury instruction No. 21 read as follows: "Another factor for your consideration in determining the appropriate penalty is the concept of fairness. Not only must the judicial system strive to accomplish equal justice; but just as importantly, it should clearly appear to all observers as though justice is being accomplished. [¶] In this case, a co-defendant, Mr. Andre Moore, who is equally culpable as a principal in these crimes, and who has a prior history of criminal activity, was allowed to plead guilty to a lesser offense of first degree murder without special circumstances, for which he received a sentence of life imprisonment with the possibility of parole. Another co-defendant, Mr. Todd Lavera, who is equally culpable as a principal in these crimes, did not face the death penalty because the People elected not to seek such penalty in that case. [¶] Measured against this, you are given a choice of only two sentencing alternatives with respect to the defendant—life imprisonment without the possibility of parole or death. [¶] You may consider the disparity of treatment between the co-defendants and the defendant in selecting the sentence to be imposed."

federal authorities—casting doubt on our rule.[22] Because such evidence is irrelevant as a matter of law, counsel were not ineffective in failing to attempt to introduce it in this trial.

### f. *Refusal to instruct on sufficiency of any mitigating evidence or factor*

■■ The defense requested that the court instruct the jury that any mitigating *evidence* could be the basis for deciding that life without possibility of parole was the appropriate punishment. The prosecutor successfully interposed an objection to the proposed instruction on the ground it was argumentative. Defendant now contends that, in sustaining the objection, the trial court violated his Eighth Amendment right to a reliable penalty determination, due process and equal protection of the law. We find no error.

The proposed instruction was indeed argumentative, in that it invited the jury to draw inferences favorable to only one party from the evidence presented at trial by informing the jury that any mitigating evidence might carry dispositive weight, without also advising that a single aggravating circumstance could have the same effect. (*People v. Hines, supra,* 15 Cal.4th at p. 1069; *People v. Mickey* (1991) 54 Cal.3d 612, 697 [286 Cal.Rptr. 801, 818 P.2d 84].) Contrary to defendant's argument, the prosecution's failure to request its own special instruction remedying that deficiency did not "waive" its objection to defendant's proposed instruction. Having thus concluded the trial court properly sustained the prosecution's objection to defendant's proposed instruction on this ground, we need not address the Attorney General's contention that the instruction was also objectionable as duplicative.

The defense also requested that the court instruct the jury that any one mitigating *factor*, standing alone, could support a decision that death was not the appropriate punishment in this case. As with defendant's proposed instruction concerning mitigating *evidence*, the court also properly rejected as argumentative the instant proposed instruction concerning mitigating *factors*.

Defendant makes the related contention that his trial counsel rendered ineffective assistance in failing to submit proposed instructions not couched in objectionably argumentative terms. The claim fails in the context of this

---

[22]We observe, too, that defendant's proposed jury instruction was argumentative and could have been refused on this basis as well. To the extent defendant asserts counsel rendered ineffective assistance by failing to propose a nonargumentative instruction on this topic, his contention must fail because, as noted in the text, the underlying facts were legally irrelevant.

direct appeal because the record does not reveal whether counsel had a plausible tactical reason for not submitting such an instruction. (*People v. Mendoza Tello, supra,* 15 Cal.4th at p. 266.) In any event, because the standard instructions actually given fully informed the jury of the principles governing its sentencing determination, it is not reasonably probable that the giving of instructions of the sort defendant contends counsel should have requested would have led to a more favorable outcome.

Defendant, finally, may be understood to argue that the trial court was obliged to read the jury his proposed instructions in order to remedy certain asserted deficiencies in CALJIC No. 8.88, with which the jury was instructed. Defendant complains that the standard instruction's references to "mitigating circumstances" and "aggravating circumstances" incorrectly suggest that a single mitigating circumstance could not outweigh any and all aggravating circumstances, which in turn failed to convey to jurors that if mitigation outweighed aggravation, they were required to impose a sentence of life without possibility of parole. He further contends the "so substantial" standard employed here for comparing aggravating and mitigating factors was unconstitutionally vague, conducive to arbitrary and capricious decisionmaking, and created an unconstitutional presumption in favor of death. We reject the premise of his argument. As we have repeatedly held, CALJIC No. 8.88 adequately guides the jury's sentencing discretion. (E.g., *People v. Gurule* (2002) 28 Cal.4th 557, 661-662 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

### g. *Refusal of requested instructions on mercy and jury's prerogative to spare defendant's life for any reason deemed appropriate*

 At defendant's request, the trial court instructed the jury that, at the penalty phase, it was free to consider sympathy, pity, compassion or mercy.[23] Defendant contends the trial court denied him a reliable penalty determination and due process of law, as guaranteed by the state and federal Constitutions, by refusing to instruct further on how the jury was to consider mercy.[24] We agree with the trial court's conclusion that the proposed instruction was argumentative in inviting the jury to draw inferences favorable to only one side. As defendant acknowledges, moreover, we have

---

[23] As read to the jury, defendant's proposed jury instruction No. 28 provided: "An appeal to the sympathy or passions of a jury is inappropriate at the guilt phase of the trial. However, at the penalty phase, you may consider sympathy, pity, compassion, or mercy for the defendant that has been raised by any aspect of the offense or of the defendant's background or character in determining the appropriate punishment."

[24] The unnumbered instruction in question read as follows: "In a capital case mercy comes into play after the jury has determined that the aggravating circumstances outweigh the mitigating. At that point a jury exercises mercy by returning a verdict of life without the possibility of parole, a sentence less than it thinks the defendant deserves."

previously held that a trial court is not required to instruct the jury that it may impose a sentence of life without possibility of parole even if it concludes the circumstances in aggravation outweigh those in mitigation. (E.g., *People v. Hines, supra*, 15 Cal.4th at p. 1070.) Thus, the trial court did not err in refusing the requested instruction. To the extent defendant asserts his trial counsel rendered ineffective assistance in failing to propose an acceptable version of this refused instruction, or that the trial court should have remedied on its own motion any flaws in the instruction, we conclude that even assuming deficient performance, prejudice is lacking inasmuch as the standard instructions given in this case adequately informed the jury as to how to make its penalty determination.

Defendant also contends the trial court erred in refusing to instruct the jury that "You may spare the defendant's life for any reason you deem appropriate and satisfactory." The trial court properly sustained the prosecutor's objection that this instruction was argumentative.

> h. *Failure to instruct sua sponte on elements of robbery and attempted murder*

As noted above, as relevant to section 190.3, factor (b), the prosecution presented evidence that defendant had robbed Margarito and Yadira Gomez and attempted to kill Joevone Elster and Mark Oropeza. Defendant contends the trial court violated his state and federal constitutional rights to due process of law and a reliable penalty determination in failing to instruct, sua sponte, on the elements of robbery and attempted murder in connection with the evidence of these offenses. Defendant acknowledges we have long and consistently held that, in view of the possible tactical reasons why the defense might not want the jury to focus unduly on a defendant's other alleged offenses rather than on the central question of the appropriate penalty, a trial court has no sua sponte duty so to instruct. (E.g., *People v. Memro, supra*, 11 Cal.4th at p. 881; *People v. Hardy* (1992) 2 Cal.4th 86, 206-207 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Defendant presents no persuasive reason to depart from these precedents.

Defendant further contends that, if the jury is not to be instructed on the elements of other alleged offenses involving the use of force or violence, the Eighth Amendment's guarantee of reliability in sentencing should be interpreted to require the trial court to obtain the defendant's express personal waiver of such instructions. But, as the Attorney General suggests, such a requirement risks infringing upon trial counsel's authority, as " 'captain of the ship,' " to "make all but a few fundamental decisions for the defendant." (*People v. Carpenter* (1997) 15 Cal.4th 312, 376 [63 Cal.Rptr.2d 1, 935 P.2d

708].) Finally, on this record we find no merit in defendant's suggestion that, absent instruction on the elements of robbery and attempted murder, the jury in this case had no principled way to determine whether the alleged offenses were criminal or involved force or violence. If the jury was convinced of defendant's guilt of the alleged activity by the requisite standard of proof, it surely would have had no difficulty determining that the acts fell within section 190.3, factor (b). Because defendant fails to demonstrate that the lack of instructions defining the elements of the unadjudicated offenses prejudiced him, his claim of ineffective assistance of counsel for failing to request such instructions must fail.

### i. *Refusal of requested instructions on defendant's good character and consideration of defendant's background*

█ The defense asked the court to instruct the jury that it could consider, in mitigation, evidence of defendant's good character for nonviolence. The trial court refused, observing no such evidence had been offered. Defendant contends the ruling was erroneous as a factual matter, in that (1) defendant's mother testified he was a good and loving person with a good heart; (2) his aunt Doris testified he was a caring, warmhearted person who cared about people and about life; (3) Roy W. Roberts II, the executive director of the Watts/Willowbrook Boys and Girls Club, testified that defendant had not gotten into trouble when he belonged to the club; and (4) Deputy Sheriff Frank Plass testified that defendant took part in the Honor Row program in county jail. The trial court's refusal of the requested instruction, defendant argues, violated his state and federal rights to a reliable penalty determination and due process of law. Implicitly acknowledging that none of these witnesses stated, in so many words, that defendant had a nonviolent character, defendant nevertheless argues their testimony constituted circumstantial evidence thereof. The Attorney General disagrees, reasoning that goodness and nonviolence are not necessarily synonymous, and evidence showing the former does not compel instruction on the latter. The Attorney General also contends the requested instruction was argumentative and duplicative of others given to the jury.

We find the Attorney General's arguments persuasive and conclude the trial court did not err in refusing the instruction. Contrary to defendant's argument, the court's ruling in no way precluded the jury from considering evidence of defendant's good character under the other instructions given.

Defense counsel also asked the court to instruct the jury that any aspect of defendant's background or character could be considered as a mitigating factor. The trial court refused on the ground that the proposed instruction

was duplicative of CALJIC No. 8.88. Noting his proposed instruction referred to "background," while the cited CALJIC instruction referred to a defendant's "record," defendant contends the trial court erred.

We disagree. Nothing on this record suggests the jury would have understood "record" to refer exclusively to defendant's *criminal* record, as he now urges, or felt somehow precluded from considering his upbringing or education. Notably, the trial court did instruct the jury, as defendant requested, that in determining the appropriate punishment it could consider sympathy, pity, compassion or mercy for defendant raised by any aspect of defendant's background or character. The trial court also instructed the jury pursuant to section 190.3, factor (k) that it should be guided in its decision by the existence of "any other circumstances which extenuates the gravity of the crimes even though . . . it is not a legal excuse for the crimes and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offenses for which he is on trial" and that the jury was "free to assign whatever moral or sympathetic value" it "deem[ed] appropriate to each and all of the various factors [it was] permitted to consider." Defendant acknowledges that another instruction he requested was, at least in part, argumentative, but he appears to suggest the trial court should have deleted the objectionable part and given the rest to the jury. Defendant fails, however, to support the implicit assertion that the trial court has the burden of modifying an improper instruction.

Defendant makes the related contention that his trial counsel rendered ineffective assistance in failing to submit a proposed instruction not couched in objectionably argumentative terms. The claim fails in the context of this direct appeal because the record does not reveal whether counsel had a plausible tactical reason for not submitting such an instruction. (*People v. Mendoza Tello, supra,* 15 Cal.4th at p. 266.) In any event, as noted above, because the standard instructions fully informed the jury of the principles governing its sentencing determination, it is not reasonably probable that the giving of instructions of the sort defendant contends counsel should have requested would have led to a more favorable outcome.

j. *Refusal of requested definition of "mitigating circumstance" and requested instruction as to which factors are mitigating and which aggravating*

The trial court defined "mitigating circumstance" for the jury with the language of CALJIC No. 8.88, as follows: "A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification

or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." The defense requested, and the trial court refused, an expanded definition of mitigating circumstance.[25] Noting we approved the requested instruction in *People v. Ray* (1996) 13 Cal.4th 313, 354, footnote 20 [52 Cal.Rptr.2d 296, 914 P.2d 846], and *People v. Osband, supra,* 13 Cal.4th at pages 705-706, defendant assigns this ruling as error under the Eighth and Fourteenth Amendments to the federal Constitution. Although the trial court would not have erred in giving the requested instruction, its refusal to do so did not constitute error. The pattern instruction adequately defined the concept of mitigation for the jury, and the requested instruction thus would have been largely duplicative.

Defendant further contends the trial court denied him his state and federal constitutional rights to a reliable penalty determination and due process of law in refusing to give his proposed jury instructions Nos. 17, 18 and 19 specifying which sentencing factors are mitigating and which aggravating, and listing numerous factual circumstances the jury might consider in mitigation.[26] But as defendant acknowledges, we have previously rejected this claim (e.g., *People v. Kipp, supra,* 18 Cal.4th at pp. 380-381); he advances no persuasive reason why we should reconsider the point. As the trial court concluded, moreover, defendant's proposed jury instruction No. 17 was

---

[25]Defendant's proposed jury instruction No. 23 read as follows: "A mitigating circumstance does not constitute a justification or excuse for the offense in question. A mitigating circumstance is a fact about the offense, or about the defendant, which in fairness, sympathy, compassion or mercy, may be considered in extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense."

[26]Defendant's proposed jury instruction No. 17 read as follows: "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except evidence that I have ordered stricken or have instructed you to disregard. You shall weigh, consider, take into account and be guided by the following aggravating or mitigating factors, if applicable: [¶] (a) As either an aggravating or mitigating factor: [¶] The circumstances of the crime of which the defendant was convicted in the present proceeding, and the existence of any special circumstance[s] found to be true. [¶] (b) As either an aggravating or mitigating factor: [¶] The presence or absence of criminal activity by the defendant, other than the crime[s] for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. [¶] (c) As either an aggravating or mitigating factor: [¶] The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings."

Defendant's proposed jury instruction No. 18 read as follows: "The factors set forth in subparagraphs (a), (b), and (c) above are the only factors that can be considered by you as aggravating factors. [¶] However, you may find one or more of these factors to be [a] mitigating factor[s]. You are not required to find that any of these factors are aggravating. It is up to you to determine whether these factors exist, and if they do exist, whether they are mitigating or aggravating. [¶] The factors set forth in subparagraphs (d), (e), (f), (g), (h), (i),

duplicative of CALJIC No. 8.85, proposed jury instruction No. 18 posed the risk of confusing the jury with its cross-references to subparagraphs contained in other proposed instructions, and proposed jury instruction No. 19 was clearly argumentative. All three proposed jury instructions thus were properly refused.

### 8. *Cumulative error*

Finally, defendant claims that cumulative error in the penalty phase denied him his state and federal constitutional rights to due process, a fair trial, the effective assistance of counsel, and a reliable and nonarbitrary sentencing determination. We have found error only in the trial court's failure to admonish the jury pursuant to section 1122 and to reinstruct the jury with general evidentiary principles in the course of its penalty phase charge, and have found these errors individually to be nonprejudicial. Viewing them cumulatively, we conclude defendant is not entitled to reversal on this record.

### III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied August 13, 2003, and the opinion was modified to read as printed above.

---

(j), (k), and (l) below can only be considered by you to be mitigating factors. The absence of a mitigating factor is not, and cannot be considered by you as, an aggravating factor."

Defendant's proposed jury instruction No. 19, spanning some 11 pages, sets out for the jury's consideration numerous assertedly mitigating circumstances disclosed by the evidence in the case.