Filed 1/15/14  P. v. Martinez CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B246488 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA077857) |
| v. | |
| EDWARD JACK MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Steven R. Van Sicklen, Judge.  Affirmed as modified.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Kenneth C. Byrne and Seth P. McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Edward Jack Martinez of second degree murder. (Pen. Code, § 187, subd.(a).)[1] The trial court found true four of defendant's prior strike conviction allegations and four prior serious felony conviction allegations, which resulted from three separate cases. (§ 1170.12, subds. (a)–(d); 667, subds. (b)–(i); 667, subd. (a).)

The trial court sentenced defendant to state prison for 45 years to life for the murder, consisting of 15 years to life tripled due to defendant's prior strike convictions. In addition, the trial court imposed five years in each of the three cases in which defendant suffered a conviction for a serious felony. (§ 667, subd. (a).) Defendant's total sentence was 15 years plus 45 years to life. Defendant appeals on the ground that the trial court erred in failing to instruct sua sponte on the heat of passion theory of voluntary manslaughter.

**FACTS**

**Prosecution Evidence**

Daniel Vigil lived at the Torrance Motel in the City of Torrance. He was good friends with Timothy Hillis, who also lived at the Torrance Motel. Vigil knew defendant only slightly. Vigil knew that Hillis had been married to defendant's sister at one time. Hillis walked with a limp and used a walking stick. It looked like a branch of a tree— smaller at the bottom and larger at the top.

On April 20, 2010, during a conversation at Hillis's doorway, Hillis mentioned to Vigil that he had had a fight with defendant earlier. As Hillis spoke, Vigil noticed defendant approaching. Defendant said to Vigil, "You better get out of the way." Defendant told Hillis, who was not wearing a shirt, to get dressed and meet him in the alley. Hillis approached defendant, and the two men began yelling at each other. They got each other into semi-headlocks and began punching each other. After a few minutes of this tussling, Hillis went back into his room and came back out carrying his walking stick like a bat. He hit defendant with it several times in the shoulder, neck, and head area. Hillis was very angry. Defendant backed up a bit and then came back towards

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

Hillis and began throwing jabs at his mid-section. At that point, Vigil noticed a knife in defendant's hand. He saw defendant land at least 10 blows with the knife. When Vigil saw that defendant had dropped the knife, he kicked it over to another resident, Joseph De La Cruz. After dropping the knife, defendant walked away. Hillis walked back to his room and lay down on his bed. Vigil tried to render aid to Hillis.

The testimony of De La Cruz, who was unavailable, was read into the record. On April 20, 2010, De La Cruz resided at the Torrance Motel on the same hallway as Hillis. De La Cruz knew that defendant visited Hillis sometimes and that they were related by marriage. On that day, at approximately 1:00 p.m., De La Cruz heard an argument in the hallway between defendant and Hillis. Later on, at approximately 3:30 p.m., he heard a commotion outside his door. He looked out and saw two people "rumbling" on the floor. Vigil, who was looking at the two fighters, kicked a knife over to De La Cruz. De La Cruz saw blood on the men tumbling around. De La Cruz kicked the knife inside his room and called 911. De La Cruz did not leave his room again until the police arrived. He then saw that there was blood all over the walls in the hallway.

The parties stipulated that Hillis's autopsy showed that he died as a result of multiple sharp instrument wounds.

Officer Josh Burden of the City of Torrance Police Department received the report of a stabbing and responded to the Torrance Motel. His investigation led him to look for defendant at the Brighton Motel, which was across the street. Officer Burden first spotted defendant standing in the doorway of a fire escape balcony wearing dark lenses and a blue robe. Seeing that defendant matched the description he had been given of a suspect, he motioned to defendant to come down and also told him to do so. Defendant waved his hands and shook his head, indicating "no" and went back inside. Defendant reappeared, and this time he obeyed the officer's orders to come out. Defendant had fresh blood behind and on his left ear. Defendant, who was not clean-shaven, said he had cut himself shaving. Officer Burden noticed more blood on defendant's left ankle and on his feet. Defendant did not indicate he had been attacked, nor did he ask for help. Defendant was taken into custody and booked.

The parties stipulated that a passing motorist, Launica Samadi, was driving past the Torrance Motel when she saw an older Hispanic male covered in blood run in front of her car. He ran across the street and entered the Brighton Motel. They also stipulated that Marcus Droubay was carrying his bicycle up the stairs at the Torrance Motel when he saw defendant pass by him with blood on his feet. Defendant did not ask for assistance.

Donald Stevanus lived at the Brighton Motel and saw defendant standing near the fire escape on the day of Hillis's death. Defendant was agitated and had blood on the front of him. Defendant asked Stevanus to call his sister for him. He gave Stevanus a card with a number. He said something bad had happened and to tell his sister he had trouble. Stevanus believed defendant was mild tempered and knew he had suffered a stroke that limited movement in one arm.

Video surveillance recordings were played for the jury. Detective Douglas Hath testified that one of the videos showed defendant wearing the same clothing that was found in his closet, covered in blood.

**Defense Evidence**

The parties stipulated that, according to the medical examiner, Hillis's blood contained .09 micrograms per milliliter of amphetamine and 1.3 micrograms per milliliter of methamphetamine.

Dr. John Treuting, a toxicologist, testified regarding the uses of methamphetamine, the methods of ingestion, and its effects on the body. The levels detected in Hillis at the autopsy indicate very high levels for use as a central nervous system stimulant. The drug has a very high addiction potential. Over time, negative effects increase. These include motor restlessness, agitation, poor focus and confusion, paranoia, and irrational behavior. Continued use can lead to aggression and violent acts. Dr. Treuting believed Hillis had taken methamphetamine multiple times.

Michael Heredia testified that in 2007 Hillis chased him with two machetes. Hillis was his neighbor at the time. Heredia thought Hillis chased him because he was going crazy.

4

Duane McClain was a friend of defendant. He knew him as a mellow person and not a violent one.

## DISCUSSION

### I. Lack of Heat of Passion Instruction

#### A. *Defendant's Argument*

Defendant contends that "the overall evidence in this case was sufficient to have triggered the trial court's obligation to instruct on the heat of passion theory of voluntary manslaughter, and the court erred in failing to do so." According to defendant, this error was prejudicial and should be reversed unless it can be shown that the error was harmless beyond a reasonable doubt.

#### B. *Proceedings Below*

The trial court instructed the jury on voluntary manslaughter based on imperfect self-defense over the objections of defense counsel, who did not want a manslaughter instruction. The defense theory was that defendant was justified in stabbing Hillis. The trial court also gave an instruction on lawful self-defense.

#### C. *Relevant Authority*

Murder is the unlawful killing of a human being with malice aforethought. Manslaughter is "the unlawful killing of a human being without malice." (§ 192.) A defendant lacks malice and is guilty of voluntary manslaughter "in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' [citation], or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith [actual] belief in having to act in self-defense [citations]." (*People v. Barton* (1995) 12 Cal.4th 186, 199.) Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, voluntary manslaughter is considered a lesser necessarily included offense of intentional murder. (*Ibid*.)

"'"Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation."'" (*People v. Souza* (2012) 54 Cal.4th 90,

5

116; *People v. Lee* (1999) 20 Cal.4th 47, 59.) "The provocation which incites the defendant to homicidal conduct . . . must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee*, at p. 59; *People v. Manriquez* (2005) 37 Cal.4th 547, 583.) "'The victim must taunt the defendant or otherwise initiate the provocation.'" (*People v. Avila* (2009) 46 Cal.4th 680, 705.) The victim's conduct may have been physical or verbal, but it must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*People v. Manriquez*, at pp. 583-584.) Thus, the heat of passion requirement has both an objective and a subjective component: "'The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively.'" (*Id*. at p. 584.) Adequate provocation and heat of passion must be affirmatively demonstrated. (*People v. Lee*, at p. 60; *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1312.)

A trial court normally must instruct the jury sua sponte on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) Thus, a trial court has a sua sponte duty to instruct the jury on lesser included offenses when there is substantial evidence that the offense committed may have been less than the offense charged. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.)

### D.  No Error

We conclude defendant was not entitled to an instruction on sudden quarrel or heat of passion.[2]  Here, the quarrel was not sudden, but was sought out by defendant.

---

[2]      The instruction defendant claims was lacking was CALCRIM No. 570, which states:  "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1.  The defendant was provoked; [¶] 2.  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3.  The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than

6

Defendant was the initial aggressor in that he went over to the victim's residence and challenged him to a fight. His challenge was met with shouts, and after he and the victim yelled at each other, they began fighting, as defendant had planned. When Hillis went back into his room for his walking stick, defendant did not retreat, but remained to re-engage in the fight, wherein he responded with deadly force to Hillis's blows from his cane. Significantly, the jury rejected the notion that Hillis's use of the walking stick justified defendant's use of lethal force. Under the circumstances of this case, a "heat of passion" theory was inapplicable.

As the Court of Appeal explained in *People v. Oropeza* (2007) 151 Cal.App.4th 73, "[a] defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*Id.* at p. 83.) "'If the defendant causes the victim to commit an act which the defendant could claim provoked him, he cannot kill the victim

from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] [If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.] [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

7

and claim that he was provoked.  In such case, he is deemed to have acted with malice and would be guilty of murder.  Thus, a defendant is guilty of murder when he arms himself and plans to insult the victim and then kill him if the victim strikes him in resentment over the insult.'"  (*People v. Johnston*, *supra*, 113 Cal.App.4th at p. 1312, quoting 2 Wharton's Criminal Law (15th ed. 1994) § 157, p. 352.)  Given that defendant, armed with a knife, went to challenge Hillis to fight and then began fighting with him in the hallway, he was "'culpably responsible'" for the altercation and cannot be heard to assert that he was provoked by the victim.  (See *People v. Johnston*, at p. 1313.)  Accordingly, the trial court did not err by failing to read sua sponte the instruction on "heat of passion" voluntary manslaughter.

## II.  Custody Credits

In a footnote, respondent asserts that the calculation of defendant's actual custody credits was incorrect.  The trial court granted defendant 1,001 actual credit days.  As respondent points out, defendant was arrested on April 20, 2010, the day of the stabbing, and he was sentenced on January 15, 2013.  Respondent is correct that defendant is entitled to 1,002 days of actual days of presentence credits.

**DISPOSITION**

The judgment is modified to award defendant 1,002 days of custody credits.  In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

8